# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSEPH C. BAMFORD and YOUNG MIN BAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2019-0005-JTL |
| PENFOLD, L.P.; DELAWARE VALLEY | ) | |
| REGIONAL CENTER, LLC; WEST 36TH, INC.; | ) | |
| JOSEPH MANHEIM; and REATH & CO., LLC; | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 4, 2019
Date Decided: February 28, 2020

David J. Margules, Elizabeth A. Sloan, Brittany M. Giusini, BALLARD SPAHR LLP, Wilmington, Delaware, Wallace G. Hilke, Mark S. Enslin, BALLARD SPAHR LLP, Minneapolis, Minnesota; *Counsel for Plaintiff Joseph C. Bamford.*

Jeffrey S. Cianciulli, WEIR & PARTNERS, Wilmington, Delaware, Peter N. Kessler, KUTAK ROCK LLP, Philadelphia, Pennsylvania; *Counsel for Plaintiff Young Min Ban.*

John G. Day, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Marc R. Rosen, Joshua K. Bromberg, KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, New York; *Counsel for Defendants West 36th, Inc., Joseph Manheim, and Reath & Co., LLC.*

William B. Chandler III, Bradley D. Sorrels, Shannon E. German, Daniyal M. Iqbal, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; *Counsel for Defendants Penfold, L.P. and Delaware Valley Regional Center, LLC.*

**LASTER, V.C.**

Before the events giving rise to this litigation, defendant Joseph Manheim and plaintiff Joseph Bamford were close friends for over twenty years. For at least a decade, Manheim served as Bamford's trusted financial and business advisor.

In 2012, at Manheim's request, Bamford provided startup capital for Delaware Valley Regional Center, LLC ("DVRC"), a company co-founded by Manheim and plaintiff Young Min Ban. DVRC facilitates investments by foreign nationals in infrastructure projects in the United States, thereby helping the foreign nationals qualify for specialized visas. In 2015, Bamford made an additional investment in DVRC.

In connection with the 2015 investment, Manheim, Ban, and Bamford documented that each held a 30% membership interest in DVRC. Defendant West 36th, Inc. ("WestCo") held the remaining 10% membership interest and served as DVRC's manager. Manheim, Ban, and Bamford comprised WestCo's board of directors (the "WestCo Board"). Manheim controlled WestCo and had the power to name the members of the WestCo Board, but Manheim's control over WestCo was not inviolate. A portion of Bamford's investment in DVRC took the form of a loan to WestCo that was convertible into a majority stake.

By 2016, DVRC was thriving, and Manheim wanted to solidify his control over the entity. To achieve this outcome, Manheim needed to neuter Bamford and Ban's rights as holders of a majority of the membership interests in DVRC. He also needed to prevent the convertible debt from providing a path to control over WestCo.

Manheim achieved both goals by convincing Bamford and Ban to go along with a

restructuring of their interests (the "Reorganization"). He told Bamford and Ban that it was advisable from a tax standpoint to create a holding company structure. To accomplish this, they would contribute their 90% membership interest in DVRC to defendant Penfold, L.P., a newly created Delaware limited partnership, and each of them would receive a one-third equity interest in Penfold. Ban agreed as long as (i) each one-third interest in Penfold carried equal economic and governance rights and (ii) they also co-owned the general partnership interest equally. Bamford trusted Manheim completely, so he did not make any demands. But Manheim needed Bamford to waive the conversion feature in WestCo's debt, so Manheim told Bamford that imminent federal legislation would restrict the ability of a foreign national to exercise control over an enterprise like DVRC. Bamford is a British citizen. Manheim claimed that by implementing the Reorganization and waiving the conversion feature, they could avoid any adverse consequences from the legislation. In reality, there was no pending legislation.

During these discussions, Manheim represented to Ban and Bamford that he had not drafted the limited partnership agreement for Penfold. In truth, the limited partnership agreement already existed and named Manheim and defendant Reath & Co., LLC ("ReathCo") as Penfold's only general partners. Manheim controlled ReathCo.

After the Reorganization, Bamford and Ban could not exercise any of the voting or other governance rights that they previously held as members of DVRC, because Penfold held those interests. Only the general partners of Penfold could cause Penfold to exercise its rights as a member of DVRC, and Bamford and Ban were not general partners of

2

Penfold. Nor could the conversion feature in WestCo's debt provide a path to control over WestCo, because that feature had been waived.

After the Reorganization, Manheim added his brother and another friend to the WestCo Board, creating a majority that could outvote Bamford and Ban if they ever opposed him. Having secured his control over WestCo and DVRC, Manheim caused DVRC to pay lucrative management fees to ReathCo. He also engaged in other interested transactions. The plaintiffs believe that Manheim has misappropriated approximately $5.9 million.

At first, Ban and Bamford did not suspect that anything was amiss. Ban was involved in the day-to-day management of DVRC, and by 2017, he had noticed and started objecting to Manheim's insider transactions. Manheim initially ignored Ban, then put him on leave, then removed him from his roles with DVRC and as a member of the WestCo Board. Bamford did not suspect anything was wrong until early 2018. After Bamford requested books and records to investigate his concerns, Manheim removed him from the WestCo Board.

Ban and Bamford brought this action. Their complaint contains thirteen counts, and the defendants moved to dismiss eleven of them for failure to state claims on which relief can be granted. This decision dismisses three counts in their entirety and a fourth count in part. The motion is otherwise denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and five exhibits submitted by the parties. Two were incorporated by reference in the complaint, and so may be considered at

3

the pleading stage. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013). Two are filings with the Delaware Secretary of State and subject to judicial notice. *See Malpiede v. Townson*, 780 A.2d 1075, 1090 (Del. 2001). The fifth is the public record of Ban's admission to the Pennsylvania State Bar, which is also subject to judicial notice. *See* D.R.E. 201(b)(2). The incorporation of documents by reference does not change the pleading standard. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences, including inferences drawn from documents.

The complaint refers to and describes provisions in various agreements. With one exception, the parties did not provide those agreements. Because "the proper interpretation of language in a contract is a question of law," and "a motion to dismiss is a proper framework for determining the meaning of contract language," it would have been helpful to have the omitted agreements. *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). Without them, this decision relies on the descriptions in the complaint, drawing reasonable inferences in the plaintiffs' favor.

## A. Bamford And Manheim

Bamford and Manheim have known each other for more than twenty-five years. During that time, they developed "a relationship that was closer than most brothers." Compl. ¶ 26. They met when Bamford was sixteen years old, and Manheim was dating Bamford's sister. Until the events leading to this lawsuit, Manheim was Bamford's closest friend for the better part of nineteen years. When Bamford was twenty-one, he joined Alcoholics Anonymous, and Manheim acted as Bamford's sponsor for the next decade.

4

The two regularly socialized and travelled together. Manheim and his wife even spent their honeymoon vacationing with Bamford. Their families were also close, and each became the godfather to the other's children. Bamford's children referred to Manheim as "Uncle Joe," and Manheim's children used the same term of affection for Bamford.

In addition to their close personal friendship, Bamford relied on Manheim as his financial and business advisor. In 2010, when Manheim was starting an investment fund, Bamford invested $6.7 million. After the fund failed, resulting in a significant loss for Bamford, he opened an account with Goldman Sachs, funded it with $2 million, and gave Manheim full access to and control over the account. Manheim also advised Bamford on family litigation matters and a bond deal. Bamford listed Manheim as his financial advisor with his accountants, giving Manheim access to Bamford's personal financial information. Manheim regularly communicated with Bamford's accountants and assisted with Bamford's tax issues.

According to the complaint, "Bamford was relatively unsophisticated with respect to complex business structures, financing and tax-related issues, and Manheim had superior knowledge, information and experience with respect to such structures, financing and tax issues." *Id.* ¶ 27. Manheim was well aware of the trust that Bamford placed in him. Manheim's "elevator speech" touted the fact that he oversaw Bamford's finances and family business.

When Manheim structured a transaction or investment for Bamford, he would send the documents to Bamford and tell him to sign. Bamford would sign the documents, trusting that Manheim was looking out for his interests and giving him truthful information.

5

On some occasions, Manheim would send documents to Bamford's assistant and ask her to obtain Bamford's signature. Bamford would routinely sign the documents, having placed his full confidence in Manheim.

## B.  DVRC

In 2012, Manheim and Ban formed DVRC as a manager-managed Delaware limited liability company. Through DVRC, Manheim and Ban would solicit capital from foreign nationals, then invest it in public infrastructure projects in the United Sates. By making these investments, the foreign nationals could qualify for visas under the EB-5 Immigration Investor Program.

Manheim asked Bamford to fund the start-up costs for the business, and Bamford invested $500,000. Three years later, in June 2015, Bamford invested another $500,000.

In connection with the June 2015 investment, Manheim, Ban, and Bamford confirmed the ownership structure of DVRC and their respective rights. They agreed that Manheim, Ban, and Bamford each owned a 30% membership interest in DVRC. WestCo held the remaining 10% membership interest and served as DVRC's manager. Manheim controlled WestCo, but WestCo had entered into a loan agreement with East 63rd Ltd. ("EastCo"), a United Kingdom private limited company, that gave EastCo the right to convert its loan into a majority equity stake in WestCo. Bamford and Manheim jointly owned EastCo.

Manheim, Ban, and Bamford comprised the WestCo Board. According to the complaint, Manheim told the plaintiffs that WestCo's role as manager of DVRC was limited to "handl[ing] expenses for DVRC, and only handl[ing] expenses—it would not

6

truly receive the profits of DVRC." *Id.* ¶ 41. Bamford and Ban understood that DVRC's profits would be split equally among Manheim, Ban, and Bamford.

Manheim and Ban ran DVRC's day-to-day operations. Manheim took responsibility for DVRC's financial affairs, including paying expenses, making distributions, and keeping its books and records for tax purposes. At some point in 2015, Manheim tried to involve ReathCo, a company that he controlled. After Ban objected, Manheim represented that ReathCo would not be involved in DVRC's operations or management. Contrary to that representation, Manheim caused DVRC and WestCo to distribute $372,000 to ReathCo in 2015. *See id.* Ex. A. The complaint alleges that ReathCo did not provide any services in exchange for the payments.

## C.    The Reorganization

By 2016, it had become clear that DVRC would be successful. DVRC had obtained millions of dollars in investments from foreign nationals, which DVRC has deployed into three major infrastructure projects. DVRC generated substantial profits by collecting a percentage of the interest that the sponsors of the infrastructure projects paid to the foreign investors. The time horizons for the investments were lengthy, so DVRC could expect to generate substantial profits for years to come. Manheim wanted to secure control over DVRC and its cash flows.

In early and mid-2016, Manheim had multiple one-on-one conversations with Ban about forming a holding company for DVRC. Manheim told Ban that the holding company structure would generate tax benefits and could be used as an investment vehicle for future ventures. Ban expressed skepticism but agreed "on the condition that [the holding

7

company] would be jointly owned one third by each of Bamford, Ban and Manheim, and that the General Partner would also be jointly owned and jointly controlled by each of Bamford, Ban and Manheim." *Id.* ¶ 46.

During the same period, Manheim had multiple "one-on-one telephone calls and . . . face-to-face conversations" with Bamford about the benefits of forming a holding company for DVRC and the need for EastCo to waive its right to convert its debt into a majority of WestCo's equity. *Id.* ¶ 54. As with Ban, Manheim told Bamford that the holding company structure would generate tax benefits and could be used as an investment vehicle for future ventures. He also told Bamford that there was imminent federal legislation that would restrict the ability of a foreign national to exercise control over a company engaged in the type of visa-facilitating business that DVRC conducted. Bamford is a British citizen, so the purported legislation would have affected DVRC. Manheim told Bamford that converting to the holding company structure would protect DVRC and Bamford's investment from the implications of the pending legislation. He also told Bamford that it was necessary to waive the conversion rights in WestCo's debt to comply with the pending legislation. Given his trust in Manheim, Bamford agreed to implement the holding company structure and waive the conversion rights. In reality, there was no pending legislation.

While these discussions were going on, Manheim formed Penfold by filing a certificate of limited partnership with the Delaware Secretary of State. Although Manheim had previously told Ban that ReathCo would not have anything to do with DVRC, the certificate named ReathCo as Penfold's general partner. Manheim also prepared a limited

8

partnership agreement for Penfold. It named Manheim, Bamford, and Ban as Penfold's only limited partners, each with a one-third partnership interest. It named Manheim and ReathCo as Penfold's only general partners.

To effectuate the Reorganization, Manheim prepared a two-page contribution agreement. *See* Dkt. 91 Ex. B (the "Contribution Agreement" or "CA"). Pursuant to its terms, Manheim, Ban, and Bamford would contribute their membership interests in DVRC to Penfold. Consistent with Manheim's representation to Ban, the Contribution Agreement recited that "each of Parties [sic] is the record and beneficial owners of 1/3 of all of the share capital, securities, shares or other equity interests of any kind (collectively, Parties own 100% of Penfold) of Penfold." *Id.* at 1.

Section 1 of the Contribution Agreement provided that "upon execution of this Agreement, Parties hereby will contribute to Penfold, their membership interests held in DVRC." *Id.* § 1. The balance of the two-page agreement consisted of recitals and miscellaneous provisions.

The bulk of the second page was devoted to a section titled "Parties Financial Acknowledgments." *Id.* § 3.2 (the "Financial Acknowledgments"). This section recited that the parties "further acknowledge and agree to the following":

> a. Parties has [sic] knowledge and experience in financial, tax and business matters to enable Parties to evaluate the merits and risks of the contribution in Penfold and to make an informed decision about the contribution of membership interests in Penfold. Parties understands [sic] that Parties' contribution in Penfold involves risk and Parties understands [sic] all of the associated risks.

9

b. Parties has [sic] been advised and given the opportunity to seek expert legal, tax and accounting advice in connection with Parties' contribution in the [sic] Penfold.

c. All financial statements, documents, records, and books pertaining to the [sic] Penfold has [sic] been made available to Parties for inspection by Parties' representatives. Parties and Parties' representatives have had the opportunity to ask questions to, and receive answers from Penfold or a representative of Penfold concerning Parties' contribution in the [sic] Penfold; and all such questions have been answered to Parties' full satisfaction. No oral representations have been made or oral information furnished to Parties of [sic] Parties' representatives in connection with Parties' contribution in Penfold.

d. The terms of this Agreement have been negotiated by Parties, and this Agreement fully and properly reflects the agreement of the parties.

*Id.*

Bamford, Ban, and Manheim signed the Contribution Agreement in their personal capacities. Manheim signed it on behalf of Penfold. The Contribution Agreement was dated as of June 10, 2016, making the Reorganization effective on that date.

## D.     Manheim's Insider Transactions

Both before and after the Reorganization, Manheim engaged in related-party transactions with DVRC. Manheim is an avid polo player, and polo is a costly hobby. In November 2014, Manheim set up a company called Polo Logistics. Ban believes that Manheim funded it with money from WestCo, used it to support his polo hobby, and caused DVRC to reimburse Polo Logistics directly or through WestCo for his polo-related expenses, including hay for his horses. *See* Compl. ¶ 73.

After the Reorganization, in early 2017, Manheim added his brother, Frank Manheim ("Frank"), and his friend, Albert Mezzaroba, to the WestCo Board. Ban objected, but Manheim added them anyway. The addition of Frank and Mezzaroba meant that

10

Manheim controlled a three-vote majority that could outvote Ban and Bamford if they ever opposed him.

With Frank and Mezzaroba on the WestCo Board, Manheim began engaging more freely in related-party transactions. Over Ban's objections, he caused DVRC to pay management fees to ReathCo, and he transferred money directly from DVRC and WestCo to ReathCo. Manheim also took loans from DVRC and WestCo. *See id.* ¶¶ 79–91. Bamford was not aware of the transactions. He continued to trust Manheim and usually did not attend meetings of the WestCo Board.

In 2017 and 2018, Manheim increased the amounts that DVRC paid to ReathCo. Historically, DVRC had paid most of its operating expenses from its own accounts, including the costs for payroll and marketing that were its largest outlays. Manheim began paying DVRC's operating expenses out of ReathCo, then causing DVRC to pay ReathCo. For example, the minutes of a meeting of the WestCo Board in June 2017 record the following discussion: "Move all executives off of DVRC payroll to [ReathCo] or new entity . . . . Compensation will be transferred for [Frank] and [Mezzaroba]. Further, Board will evaluate [ReathCo] vs. new entity as appropriate vehicle for executives and executive operations going forward." *Id.* ¶ 107. Although the WestCo Board never approved using ReathCo as a management vehicle, Manheim caused WestCo and DVRC to transfer $1 million to ReathCo during the second half of 2017. *See id.* Ex. A. During this period, DVRC continued to pay compensation to its own executives and employees. *Id.* ¶ 108.

By running DVRC's expenses through ReathCo, Manheim made his actions less transparent and interfered with the ability of the WestCo Board to monitor his activities.

11

Ban regularly questioned DVRC's expenses and asked for a breakdown of the amounts that ReathCo was paying on DVRC's behalf. Manheim never gave Ban any information. Instead, Manheim reacted angrily and accused Ban of "not being a team player." *Id.* ¶ 82.

During 2018, Ban observed additional transfers from DVRC to Manheim or his entities, including:

- Two wire transfers in the amount of $100,000 from DVRC to Friends of Work to Ride, a charity that Manheim formed.

- Two wire transfers from WestCo to pay for a car for Manheim, including a transfer in the amount of $50,431.94.

- Approximately $1 million in transfers from DVRC to ReathCo.

Ban believes that by May 2018, Manheim had received approximately $5.8 million from DVRC. Ban had received approximately $2.8 million. Bamford had received approximately $1.8 million.

## E.     Bamford Becomes Concerned.

Bamford was not involved in the day-to-day operations of DVRC. He relied on Manheim to operate the business. Bamford had no idea that after the Reorganization, Manheim had increased the scope of his related-party transactions or that Ban was objecting to Manheim's conduct.

In January 2018, DVRC made a distribution in the amount of $1 million. Bamford understood that DVRC would make an additional distribution in the amount of $700,000 later that year. Then Manheim told Bamford that no additional distributions would be made in 2018. This was the second financial issue involving the Company that affected Bamford personally. Manheim had previously caused WestCo to default on its loan from EastCo,

12

which Bamford had funded, but Bamford had not pressed Manheim to cure the default because he trusted him.

Now, Bamford became concerned. He tried to gain an understanding of DVRC's revenues and expenses. He even sent one of his accountants to visit DVRC's offices, but the accountant was not given access to any records. Bamford became worried that Manheim was concealing information from him.

Bamford contacted Ban. Bamford had never previously spoken with Ban without Manheim present. Ban told Bamford that Manheim had suspended him from his duties at DVRC. This caused Bamford to become more concerned, because he understood that Ban was running virtually all of DVRC's daily operations. Shortly thereafter, Bamford asked Manheim how Ban was performing, and Manheim responded that everything was "fine." *Id.* ¶ 91. That misrepresentation increased Bamford's level of concern. In subsequent conversations with Ban, Bamford learned about Manheim's mismanagement of DVRC and the volume of interested transactions.

In June 2018, Manheim terminated Ban from his positions with DVRC and removed him from the WestCo Board. Manheim previously had convinced Ban to characterize his salary as a loan for tax purposes, promising him that the loan would be forgiven. Manheim joined Ban by characterizing his own salary as a loan. After terminating Ban, Manheim demanded repayment of Ban's loan (but did not repay his own).

On June 27, 2018, Manheim filed an amendment to Penfold's certificate of limited partnership with the Delaware Secretary of State. The amendment named Manheim as an additional general partner of Penfold. Dkt. 91 Ex. C.

## F. The Books And Records Action

In July 2018, Bamford sent a demand for books and records to DVRC. Because of the Reorganization, Bamford was no longer a member of DVRC. Instead, he was a limited partner in Penfold, the entity that owned a 90% membership interest in DVRC. Manheim would only give Bamford access to books and records if he "acknowledg[ed] that (a) the Contribution Agreement was valid and (b) he was bound by the terms of the Penfold Partnership Agreement." Compl. ¶ 94. Bamford declined.

In early August 2018, Manheim provided Bamford with limited access to documents. The inspection took place at ReathCo's offices, where Manheim runs DVRC, Penfold, and WestCo. Manheim did not produce any financial records for 2018.

Later that month, Manheim took $1.8 million from DVRC to repay EastCo's loan to WestCo. Manheim refused to permit EastCo to release any funds to Bamford. Shortly thereafter, Manheim notified Bamford that he had been removed from the WestCo Board.

In October 2018, Bamford filed a books and records action. Manheim made a supplemental production, and the action was dismissed without prejudice.

Bamford hired a forensic accounting firm to analyze the records. The firm determined that Manheim had misappropriated $5.9 million between 2014 and 2018. This was in addition to $1.85 million in distributions that Manheim received from DVRC and Penfold.

## G. This Litigation

On January 9, 2019, Bamford filed this action. In April, Ban intervened. The plaintiffs filed a consolidated complaint, and the defendants answered and moved to

14

dismiss the vast majority of the counts. The plaintiffs then amended their complaint. The defendants answered, renewed their motion to dismiss, and caused DVRC to assert a counterclaim against Ban to recover the loans that Ban says reflect his compensation.

The currently operative complaint contains thirteen counts:

- In Count I, the plaintiffs assert a derivative claim on behalf of Penfold for breach of fiduciary duty against Manheim and ReathCo.

- In Count II, the plaintiffs assert a derivative claim on behalf of DVRC for breach of fiduciary duty against Manheim and WestCo.

- In Count III, the plaintiffs assert a derivative claim on behalf of Penfold for fraud against Manheim and ReathCo.

- In Count IV, the plaintiffs assert a derivative claim on behalf of Penfold for breach of contract against Manheim and ReathCo.

- In Count V, the plaintiffs assert a derivative claim on behalf of DVRC for fraud against Manheim, WestCo, and ReathCo.

- In Count VI, the plaintiffs assert personal claims for conversion against Manheim.

- In Count VII, Bamford asserts a personal claim for breach of fiduciary duty against Manheim.

- In Count VIII, Bamford asserts a personal claim for common law fraud against Manheim.

- In Count IX, Ban asserts a personal claim for common law fraud against Manheim.

- In Count X, the plaintiffs assert direct claims on their own behalf and a derivative claim on Penfold's behalf for unjust enrichment against Manheim.

- In Count XI, Bamford asserts a personal claim for negligent misrepresentation against Manheim.

- In Count XII, Ban asserts a personal claim for negligent misrepresentation against Manheim.

- In Count XIII, the plaintiffs seek a declaration that Penfold's limited partnership agreement is void.

15

The defendants answered Counts I and XIII and moved to dismiss the other counts.

## II.        LEGAL ANALYSIS

The defendants have moved to dismiss Counts II through XII for failing to state a claim on which relief can be granted. *See* Ch. Ct. R. 12(b)(6). When considering such a motion, a court applying Delaware law (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

This decision starts with the counts that the plaintiffs have asserted in their personal capacities, because those are the most straightforward. This decision next turns to the claims that the plaintiffs have asserted derivatively, where the defendants contend that the Reorganization deprived the plaintiffs of their standing to sue. Having dealt with the standing arguments, this decision addresses the few merits-related challenges to the derivative claims.

## A.    Count VII: Bamford's Personal Claim Against Manheim For Breach Of Fiduciary Duty

In Count VII, Bamford asserts a personal claim for breach of fiduciary duty against Manheim. Bamford maintains that Manheim acted as his fiduciary by virtue of his role as Bamford's trusted financial advisor, together with their longstanding friendship that rose to a level of familial closeness. Bamford contends that because of Manheim's status as his

16

personal fiduciary, Manheim was obligated to act loyally by pursuing Bamford's personal best interests throughout the events giving rise to this litigation, regardless of what other formal roles Bamford and Manheim might have occupied at the time.

For followers of this court's jurisprudence, this is a relatively uncommon claim. In the type of case most commonly pursued in this court, a stockholder sues the directors of a corporation for breaching the fiduciary duties they owe to the corporation and its undifferentiated equity. In that setting, the stockholder can sue derivatively on behalf of the corporation or directly on behalf of its equity holders, but the claim is a feature of the bundle of property rights represented by shares; it is not personal to the individual that happens to hold the shares.[1] Bamford's claim is personal to him. From a structural standpoint, the alleged fiduciary relationship parallels other person-to-person fiduciary relationships, such as an agent's duties to his principal or a guardian's duties to her ward.

To bring a claim for breach of fiduciary duty, a plaintiff must establish "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc.*

---

[1] *See Urdan v. WR Capital P'rs, LLC*, 2019 WL 3891720, at *8, *11 (Del. Ch. Aug. 19, 2019) (noting that "[t]he right to sue derivatively is a property right associated with share ownership" and that "[l]ike the right to assert a derivative claim, the right to assert a direct claim is a property right associated with the shares"); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1043–57 (Del. Ch. 2015) (distinguishing among direct claims, derivative claims, dual-natured claims, and personal claims); *see also Hutchison v. Bernhard*, 220 A.2d 782, 783–84 (Del. Ch. 1965) (determining that plaintiff who sold shares no longer had standing to pursue derivative claim); 12B Carol A. Jones, *Fletcher's Cyclopedia of the Law of Corporations* § 5908, at 490–91 (2009) (explaining that in a corporate derivative action "[t]he corporation is not merely a formal party, but is an indispensable party to the action" and that "[t]he shareholder, as a nominal party, has no right, title, or interest in the claim itself").

*v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). The only issue in dispute at the pleading stage is whether Manheim owed fiduciary duties to Bamford.

At bottom, "[a] fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person in another to protect the interests of another." *Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689, 690 (Del. Ch.), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973); *accord Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *2 (Del. Ch. July 5, 1995). "[T]he question of whether or not the particular relationship . . . rise[s] to fiduciary status is one of fact." *White v. Lamborn*, 1977 WL 9612, at *4 (Del. Ch. Mar. 16, 1977). "[C]ourts have consciously refused to delineate those situations where a fiduciary relationship may exist . . . because in the ramifications of human activity, it is undesirable to fix a rigid limitation on the application of such a salutary principle." *Swain v. Moore*, 71 A.2d 264, 294 (Del. Ch. 1950).

Multiple factors can contribute to a judicial finding that a fiduciary relationship exists. *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *14 (Del. Ch. Dec. 22, 2010). Here, the complaint cites factors that support a reasonable inference that Manheim acted as Bamford's fiduciary.

The first factor is Manheim's role as Bamford's financial advisor. "Agents are fiduciaries when they are authorized to 'alter the legal relations between the principal and third persons . . . .'" *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106 (Del. 2006) (quoting *Restatement (Second) of Agency* § 12 (Am. L. Inst. 1958)). "The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property

of another as if it were her own."[2] Financial advisors and brokers act as fiduciaries when managing and investing their clients' funds. *See O'Malley v. Borris*, 742 A.2d 845, 849 (Del. 1999) (explaining that a stock broker owes fiduciary duties to his client); *Goodrich v. E.F. Hutton Gp., Inc.*, 1991 WL 101367, at *2 (Del. Ch. June 7, 1991) (inferring at pleading stage that fiduciary relationship existed between investment advisor and client).

Manheim served as Bamford's financial advisor for over ten years and, in that capacity, controlled and managed Bamford's property. At one point, Manheim managed $6.7 million of Bamford's money. After that venture failed, Bamford deposited $2 million into a Goldman Sachs investment account and gave Manheim authority over the account.

---

[2] *Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *3 (Del. Ch. Aug. 5, 2009); *see Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015) ("Inherent in the fiduciary relationship, 'which derives from the law of trusts,' is that the fiduciary exercise control over the property of another . . . ." (quoting *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 495 (Del. 2003))); *Dickerson v. Murray*, 2015 WL 447607, at *5 (Del. Super. Feb. 3, 2015) ("Customarily, a fiduciary is one who is entrusted with the power to manage and control the property of another." (internal quotation marks omitted)); *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1036–37 (Del. Ch. 2005) ("Typically, fiduciary duties are imposed when someone exercises dominion and control over the assets and property of another such that the controlling person should be prohibited from dealing with those assets and property in a manner than unfairly profits himself."); *Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 864 (Del. Ch. 1999) ("[A] fiduciary is typically one who is entrusted with the power to manage and control the property of another"); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991) ("I understand the principle of fiduciary duty, stated most generally, to be that one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."); *see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *10 (Del. Ch. Oct. 9, 2007) (inferring at pleading stage that fiduciary relationship existed because "the Investment Advisor . . . ratified investment decisions, and had authority to purchase and sell investments for the Fund").

Manheim did not just have discretionary trading authority; he had full access to and control over the account. Manheim also provided financial and business advice to Bamford more generally. He advised him on pending litigation involving his family and on a potential bond deal. As a matter of practice, whenever Bamford considered a business transaction, he would consult with Manheim in some fashion. Manheim understood that Bamford thought of him as a trusted advisor and cultivated that role. He routinely held himself out to others as Bamford's financial advisor, and his "elevator speech" informed people that he oversaw Bamford's finances and his family business. *See* Compl. ¶¶ 27–30.

A second factor indicating a fiduciary relationship is when a person has "unrestricted access" to another person's confidential information.[3] As a result of Manheim's status as Bamford's trusted financial and business advisor, Bamford routinely provided Manheim with confidential information. Between 2015 and 2018, Manheim had deep familiarity with Bamford's personal affairs, regularly assisted Bamford with tax issues, and communicated with Bamford's accountants. Indeed, Bamford listed Manheim as his financial advisor with his accountants, giving Manheim the ability to access

---

[3] *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1058 (Del. Super. 2001); *see Breakaway Sols., Inc. v. Morgan Stanley & Co.*, 2005 WL 3488497, at *2–3 (Del. Ch. Dec. 8, 2005) (inferring at pleading stage that fiduciary relationship existed between underwriters and client where complaint alleged that client provided underwriters with "confidential and proprietary information," that underwriters "had superior knowledge, information and experience concerning the underwriting and IPO process," and that client "relied upon the Defendants' expertise" (internal quotation marks and alterations omitted)); *see also McMahon v. New Castle Assocs.*, 532 A.2d 601, 605 (Del. Ch. 1987) (noting absence of any "element of confidentiality" in determining that parties had a "straightforward commercial relationship").

Bamford's financial information directly and provide his accountants with instructions and advice. Bamford regularly and openly shared confidential financial information with Manheim with the expectation that Manheim would use the information to provide him with advice. After Bamford questioned Manheim's actions in connection with the events giving rise to this case, Manheim demonstrated that he possessed confidential information about Bamford's finances by threatening Bamford with adverse tax consequences unless he acquiesced to Manheim's conduct. *See* Compl. ¶ 31.

A third factor indicating a fiduciary relationship is when a person has "superior knowledge and experience" on which another person relies.[4] The complaint pleads that Bamford "was relatively unsophisticated with respect to complex business structures, financing and tax-related issues, and Manheim had superior knowledge, information and experience with respect to such structures, financing and tax issues." Compl. ¶ 27. The complaint pleads at length that Manheim acted as Bamford's trusted financial and business advisor. It also pleads that Manheim structured financial transactions for Bamford and

---

[4] *Breakaway*, 2005 WL 3488497, at *3; *see Petenbrink v. Superior Home Builders, Inc.*, 1999 WL 1223786, at *2 (Del. Super. Nov. 1, 1999) ("[W]here the party in whom trust and confidence is placed has superior knowledge of or a high degree of expertise in the matter covered by the contract, then the relationship between those parties is fiduciary in nature." (internal quotation marks omitted)); 37 C.J.S. *Fraud* § 8, Westlaw (database updated Feb. 2020) ("A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill, or expertise and is under a duty to represent the interests of the other."); *see also Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429 (S.D.N.Y. 2006) (explaining New York law recognizes that "a fiduciary duty may arise from a business transaction where defendant had superior expertise or knowledge about some subject . . ." (internal quotation marks omitted)).

assisted Bamford with tax and accounting issues. These allegations provide support for a reasonable inference that Bamford was less sophisticated than Manheim and relied on Manheim's superior knowledge and expertise. According to the complaint, Bamford relied on Manheim to such a degree that if Manheim ever wanted Bamford to sign a document, he could send it to Bamford's assistant. The assistant would give it to Bamford, who would routinely sign documents in reliance on his relationship with Manheim. *See id.* ¶ 32.

The final factor for purposes of this case is Manheim and Bamford's lengthy friendship, which reached a level of familial intimacy. "[M]ere personal friendship" is not sufficient to establish a fiduciary relationship. *Clark v. Davenport*, 2019 WL 3230928, at *15 (Del. Ch. July 18, 2019). But close friendships that resemble familial relationships can take on a fiduciary character. *See White*, 1977 WL 9612, at *4; *Swain*, 71 A.2d at 267.

At the pleading stage, the complaint's allegations of a deep and intimate friendship are sufficiently strong to contribute to an inference of a fiduciary relationship. Bamford and Manheim have known each other for more than twenty-five years and were best friends for the better part of nineteen years. During that time, they developed "a relationship that was closer than most brothers." Compl. ¶ 26. They met when Bamford was sixteen years old, and Manheim was dating Bamford's sister. When Bamford was twenty-one, he joined Alcoholics Anonymous, and Manheim acted as his sponsor for the next decade. They regularly socialized and vacationed together. They were so close that Manheim and his wife spent their honeymoon vacationing with Bamford. Their families became close as well. Manheim served as the godfather to Bamford's children, who called Manheim "Uncle

22

Joe." Bamford likewise served as the godfather to Manheim's children, who used the same term of affection to refer to Bamford.

Taken as a whole, these allegations support a reasonable inference of a fiduciary relationship. Manheim served as Bamford's financial advisor. He exercised control over significant assets and oversaw Bamford's personal finances. Bamford trusted and relied on Manheim, who had superior knowledge and expertise. All of their interactions took place in the context of a close and intimate friendship that reached a familial level.

To defeat this pleading-stage inference, Manheim cites a representation in the Financial Acknowledgments of the Contribution Agreement that states, "[Bamford] has knowledge and experience in financial, tax and business matters to enable [Bamford] to evaluate the merits and risks of the contribution in Penfold and to make an informed decision about the contribution." CA § 3.2.a. That statement is a single representation in a single agreement for a single transaction. Manheim structured the transaction, prepared the Contribution Agreement, and convinced Bamford to sign it. At most, it addresses Bamford's competence in financial, tax, and business matters, not the extent to which he relied on Manheim or whether Manheim acted as Bamford's fiduciary.

To infer from a single representation in the agreement at the heart of this lawsuit that Bamford did not place special trust in Manheim would require the court to draw a pleading-stage inference in favor of Manheim. At the pleading stage, the plaintiffs benefit from all reasonable inferences. In this case, a reasonable inference can be drawn that Manheim exploited his fiduciary relationship with Bamford by asking him to sign the Contribution Agreement, which Bamford did in reliance on the person he trusted.

23

The complaint thus pleads a reasonable inference that Manheim was Bamford's fiduciary. Manheim did not move to dismiss Count VII on any grounds other than the failure to plead a fiduciary relationship. Therefore, the motion to dismiss as to Count VII is denied.

## B. Counts VIII And IX: The Plaintiffs' Personal Claims Against Manheim For Common Law Fraud

In Counts VIII and IX, the plaintiffs assert personal claims against Manheim for common law fraud. Ban advances a claim of fraud based on the characterization of his compensation as a loan. Both Bamford and Ban assert claims of fraud that challenge the Reorganization.

To state a claim for common law fraud, a complaint must plead the following elements:

1) a false representation, usually one of fact, made by the defendants;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The first element can be satisfied if a defendant deliberately conceals a material fact or remains silent about a material fact in the face of a duty to speak. *Id.*; *accord Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

24

Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." "Court of Chancery Rule 9(b) is identical to Federal Rule of Civil Procedure 9(b)." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.15 (Del. 1993). When interpreting Court of Chancery Rule 9(b), Delaware courts have relied on both state and federal authorities.[5]

A leading treatise on the Federal Rules of Civil Procedure summarizes the particularity requirement as follows:

> The innumerable federal cases on the subject of alleging fraud suggest that it is prudent for the practicing lawyer to plead all of the elements of fraud and to do so in some detail—whenever that is possible—even though some of them actually are not the "circumstances" to which Rule 9(b) applies. In point of fact, the reference to "circumstances" in the rule is to matters such as the time, place, and contents of the false representations or omissions, as well as the identity of the person making the misrepresentation or failing to make a complete disclosure and what that defendant obtained thereby. A formulation popular among courts analogizes the standard to "the who, what, when, where, and how: the first paragraph of any newspaper story."

5A Arthur R. Miller et al., *Federal Practice and Procedure* § 1297 (4th ed.), Westlaw (database updated Aug. 2019) [hereinafter Wright & Miller] (footnotes omitted). "A

---

[5] *See, e.g.*, *id.* at 1208; *Quadrant Structured Prods. Co., Ltd. v. Vertin* (*Quadrant I*), 102 A.3d 155, 198 (Del. Ch. 2014); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 n.112 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE); *Joyce v. RCN Corp.*, 2003 WL 21517864, at *3 n.12 (Del. Ch. July 1, 2003); *State ex rel. Brady v. Publ'rs Clearing House*, 787 A.2d 111, 115 & n.13 (Del. Ch. 2001); *York Linings v. Roach*, 1999 WL 608850, at *2 & n.8 (Del. Ch. July 28, 1999).

pleading that simply alleges the technical elements of fraud without providing such underlying supporting details will not satisfy the rule's pleading-with-particularity requirements." *Id.* The "most basic consideration" when evaluating particularity is "how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading." *Id.* § 1298.

Delaware follows these principles and generally calls upon plaintiffs to frame their allegations using the newspaper-story format by alleging "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Yet Delaware law also recognizes that "[t]he test of whether an attempted pleading of fraud states sufficient 'circumstances' to satisfy Rule 9 is not scientific." *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 19, 1989). As Chancellor Allen explained, "Generally, it may be said that an allegation of fraud is legally sufficient under Rule 9(b) if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged." *Id.* (internal quotation marks and alterations omitted). Put differently, "the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim." *Abry*, 891 A.2d at 1050; *accord H-M Wexford LLC v. Encorp.*, 832 A.2d 129, 145 (Del. Ch. 2003). "[A] plaintiff need not allege evidentiary details." *Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987).

In the current case, the defendants' principal arguments about the complaint's lack of particularity turn on its failure to identify a precise date, time, and place when the false representations were made. As to these issues,

> Delaware courts have adopted the reasoning of the Third Circuit in [*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984)] and consistently found that the date, place, and time allegations are not required so long as the pleadings put defendants on notice of the misconduct with which they are charged and protect defendants against false charges of immoral or fraudulent behavior.

*Yavar Rzayev, LLC v. Roffman*, 2015 WL 5167930, at *4 (Del. Super. Aug. 31, 2015) (collecting authorities); *accord LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2019) ("[L]ack of specificity as to date, place, and time are not fatal, *provided that* the pleadings put defendants on sufficient notice of the actual misconduct with which they are charged."). "[A]n excessive focus on particularity [as to these matters] could impair the flexibility and the just determination of cases." *Sammons v. Hartford Underwriters Ins. Co.*, 2010 WL 1267222, at *4 (Del. Super. Apr. 1, 2010).

### 1. Ban's Fraud Claim About His Compensation

Ban claims that in early 2017, Manheim fraudulently induced him to characterize the salary he had received in 2015 and 2016 as a loan from DVRC. Manheim told Ban that DVRC would forgive his loan, thereby generating a tax loss for DVRC that would be passed through to its members. Manheim said that he was characterizing his own salary in the same way. *See* Compl. ¶¶ 67–68. Manheim issued Form 1099s to Ban that documented the loan forgiveness, and as late as September 2017, made tax filings that treated the compensation DVRC paid to Ban and other executives as loans that had been written off.

27

*See id.* ¶ 69. In 2018, however, after Ban began objecting to Manheim's actions, Manheim reversed the write-offs, and he subsequently caused DVRC to sue Ban in this action to recover the purported loans. *See id.* ¶ 70. Ban alleges that he relied on Manheim's representations to his detriment by giving up compensation to which he was entitled and subjecting himself to the loan claim. *See id.* ¶ 71.

These allegations are sufficiently particularized to give Manheim fair notice about the specific nature of the charges against him so that he can frame a responsive pleading. As a result, the allegations fulfill the core purpose of Rule 9(b). Ban has not identified a precise date, time, and place when Manheim made the misrepresentations, nor has he attempted to put specific words into Manheim's mouth, but he has described the time frame and the substance of the representations in sufficient detail so that Manheim has fair notice of the allegations against him. Ban has also made specific references to tax filings, such as Form 1099s and a tax filing by DVRC in September 2017. Manheim is not facing vague or generalized charges of immoral or fraudulent behavior. He knows what Ban contends that he did. He can admit or deny it in a responsive pleading, gather information to defend himself, and frame appropriate discovery.

Other than relying on Rule 9(b), Manheim does not identify any other grounds for dismissing Ban's fraud claim based on his compensation. Accordingly, the motion to dismiss as to Count IX is denied as to this aspect of Ban's fraud claim.

## 2. The Plaintiffs' Fraud Claims Based On Oral Misrepresentations About The Reorganization

Both Ban and Bamford claim that Manheim made oral representations that induced them to enter into the Reorganization. Manheim responds that their allegations are not sufficiently particularized. He also contends that Ban and Bamford disclaimed any reliance on oral misrepresentations.

### a. Ban's Claim Is Sufficiently Particularized.

Ban alleges that to induce him to enter into the Reorganization, Manheim told him that Penfold's general partner would be jointly owned and controlled by Bamford, Ban, and Manheim. *See* Compl. ¶ 46. He alleges that Manheim made the representation in "multiple one-on-one conversations between early and mid-2016." *Id.* ¶ 45; *see id.* ¶ 178. The complaint also alleges that

> Manheim agreed to Ban's requirements of joint ownership and control. Also in one-on-one conversations between early and mid-2016, Manheim agreed with Ban that no governing documents would be finalized without sign-off by each of Ban and Bamford. Indeed, Manheim assured Ban in 2016 that no final documents were in place, and that the three partners would only settle on final documents and structure for Penfold and its General Partner if all three of them could agree on such structure.

*Id.* ¶ 49; *see id.* ¶ 178.

As with Ban's allegations about his compensation, these allegations are sufficiently particularized to give Manheim fair notice about the specific charges against him so that he can frame a responsive pleading. The allegations thus fulfill the core purpose of Rule 9(b). Here again, Ban has not identified a precise date, time, and place when the representations took place, but he has provided a detailed description of the nature of

29

Manheim's statements and adequate context to inform Manheim about what Ban contends he did. Manheim is not facing vague or generalized charges of immoral or fraudulent behavior. As with the loan charges, Manheim has fair notice of the nature of Ban's allegations, can admit or deny them in a responsive pleading, can gather information to defend himself, and can frame appropriate discovery.

These allegations are sufficient to meet the particularity requirement. Rule 9(b) does not provide grounds for dismissing this aspect of Ban's fraud claim.

### b. Bamford's Claim Is Sufficiently Particularized.

Like Ban, Bamford claims that Manheim made oral representations that induced him to enter into the Reorganization, but Bamford's claim differs from Ban's. According to Bamford,

> In one-on-one telephone calls and one or more face-to-face conversations in the first half of 2016, Manheim told Bamford he had to contribute his interests in DVRC to a new limited partnership, Penfold, which would effectively act as a holding company. Manheim falsely represented that this transfer was necessary to promote the health of DVRC, to protect Bamford's economic and voting interests, to make the investment more tax efficient, and because of imminent legislation restricting the ability of foreign nationals to exercise control over [companies in the same business] as DVRC
> . . . .

Compl. ¶ 54. Bamford later contends that Manheim's "misrepresentations included that the transfer of Bamford's interests in DVRC was necessary to promote the health of DVRC, to protect Bamford's economic and voting interests, and to make the investment more tax efficient." *Id.* ¶ 170. Bamford further asserts Manheim made oral representations about imminent federal legislation in order to fraudulently induce Bamford to waive the conversion feature in WestCo's debt. *Id.* ¶ 64.

30

These allegations are sufficiently particularized. They detail the specific content of Manheim's misrepresentations, the time frame when they occurred, and the medium (one-on-one phone calls). Bamford has not identified a precise date and time when the representations took place, but he has provided a detailed description of Manheim's statements and ample context. Here again, Manheim is not facing vague or generalized charges of immoral or fraudulent behavior. He has fair notice of the nature of Bamford's allegations against him, can either admit or deny them in a responsive pleading, can gather information to defend himself, and can frame appropriate discovery.

These allegations are sufficient to meet the particularity requirement. Rule 9(b) does not provide grounds for dismissing this aspect of Bamford's fraud claim.

### c.     The Financial Acknowledgments

To state a claim for common law fraud, a plaintiff must allege reasonable reliance on the false representations. Manheim argues that even if he made false oral representations to the plaintiffs, they cannot plead reasonable reliance because in the Financial Acknowledgements, they represented that Manheim had not made any oral representations.

Sophisticated parties bargaining at arms' length can agree to limit the information on which they have relied to the written representations in the contract, and such a provision will be enforced. *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015). A sophisticated party cannot promise in a written agreement "that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry*, 891 A.2d at 1057.

31

For sophisticated parties to achieve this result, their contract "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004). "[A] specific formula, such as the two words '*disclaim reliance*,'" is not required. *Prairie Capital*, 132 A.3d at 51 (quoting *Anvil Hldg. Corp. v. Iron Acq. Co., Inc.*, 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013)). That said, "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations." *Abry*, 891 A.2d at 1059.

In *Anvil*, this court held that a combination of provisions in a detailed stock purchase agreement that had been negotiated at arms' length between sophisticated parties *was not* sufficiently specific to foreclose reliance on extra-contractual representations. 2013 WL 2249655, at *8. One provision stated that except for representations and warranties found in the agreement, "neither the Company nor any Seller 'makes any other express or implied representation or warranty with respect to the Company . . . or any Seller or the transactions contemplated by this Agreement.'" *Id.* (alteration in original). The other provision was a standard integration clause. *Id.*

In *Prairie Capital*, this court held that a combination of provisions in a detailed stock purchase agreement that had been negotiated at arms' length between sophisticated parties *was* sufficiently specific to foreclose reliance on extra-contractual representations. 132 A.3d at 50–51. The principal provision stated:

32

The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the Double E Companies. In making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE DOUBLE E PARTIES CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER IN CONNECTION WITH THE TRANSACTION, AND THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF DOUBLE E AND THE SUBSIDIARIES) ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES.

*Id.* at 50 (internal quotation marks omitted). The stock purchase agreement then backed up this provision with a standard integration clause. *Id.*

In this case, the pertinent language in the Financial Acknowledgments states that "Parties and Parties' representatives have had the opportunity to ask questions to, and receive answers from Penfold or a representative of Penfold concerning Parties' contribution in . . . Penfold" and that "[n]o oral representations have been made or oral information furnished to Parties or Parties' representatives in connection with Parties' contribution in Penfold." CA § 3.2.c. The Contribution Agreement also contains a standard integration clause. *See id.* § 2.2.

These provisions more closely resemble the inadequate combination in *Anvil* than the clearer, more detailed, and ultimately sufficient combination in *Prairie Capital*. The

33

closer resemblance to the *Anvil* provisions counsels in favor of not dismissing the plaintiffs' fraud claims at the pleading stage.

More importantly, it is reasonable to infer in this case that the provisions were not negotiated at arms' length by sophisticated parties in a context where both sides were fully aware of the implications of agreeing to contractual limitations on the scope of the information that the plaintiffs had received. The contractual freedom to craft contracts that insulate parties from false statements extends only to sophisticated parties.[6] It is not a license for wily actors to take advantage of their fellow citizens.[7]

---

[6] *See, e.g.*, *Abry*, 891 A.2d at 1035 ("Delaware law permits sophisticated commercial parties to craft contracts that insulate a seller from a rescission claim for a contractual false statement of fact that was not intentionally made."); *id.* at 1061 ("We also respect the ability of sophisticated businesses, such as the Buyer and Seller, to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability."); *id.* at 1061–62 ("[T]he common law ought to be especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts."); *H-M Wexford*, 832 A.2d at 142 n.18 ("[S]ophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").

[7] *See Norton v. Poplos*, 443 A.2d 1, 6–7 (Del. 1982) (rejecting argument that merger clause prevented a potential buyer of a building from relying on a misrepresentation as to zoning); *Webster v. Palm Beach Ocean Realty Co.*, 139 A. 457, 460 (Del. Ch. 1927) (holding in case involving an unsophisticated party that "[a] perpetrator of fraud cannot close the lips of his innocent victim by getting him blindly to agree in advance not to complain against it"); *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 214–18 (3d Cir. 2005) (discussing *Norton* and distinguishing between sophisticated and unsophisticated parties); *Kronenberg*, 872 A.2d at 590 (same); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001) (same).

For reasons discussed previously, the complaint pleads facts which support the reasonable inferences that Manheim acted as Bamford's fiduciary and that Bamford relied on his greater sophistication in business matters. Ban also had ample reasons to trust Manheim, including their status as long-time business partners and co-founders of DVRC. The pled facts suggest that the parties did not approach the Reorganization as a negotiated transaction in which they were bargaining at arms' length. The complaint adequately pleads that Manheim pitched the Reorganization as a mere reshuffling of their ownership interests that resulted in a change in form, not of substance. The Contribution Agreement itself reflects the informal nature of the transaction. Unlike the lengthy and heavily lawyered stock purchase agreements at issue in *Anvil* and *Prairie Capital*, the Contribution Agreement is a two-page document with just one implementing clause. At the pleading stage, there does not appear to be anything that would have put Bamford or Ban on notice that they needed to shift out of a mode in which they could trust their business partner, fiduciary, and friend and into the bare-knuckle world of adversarial negotiations.

The defendants attempt to establish that the plaintiffs are sophisticated by relying on other statements in the Financial Acknowledgments. Those statements recite that "Parties understands [sic] that Parties' contribution in Penfold involves risk," "Parties understands [sic] all of the associated risks," and the parties could "evaluate the merits and risks of the contribution in Penfold and [could] make an informed decision about the contribution." CA § 3.2.a. At the pleading stage, it is reasonable to infer that Manheim crafted these statements in an effort to insulate from challenge the very transaction in which he took advantage of the trust of his friends and business partners. To rely on them

35

conclusively at the pleading stage would be to permit Manheim to insulate himself from claims for fraud brought by less sophisticated individuals in a scenario where it is reasonable to infer that the provisions themselves were the product of fraud.

At a later stage of the case, the evidence may show that the Financial Acknowledgements should be given effect. At the pleading stage, they do not prevent the plaintiffs from advancing their fraud claims based on oral misrepresentations.

### 3. The Plaintiffs' Fraud Claim Based On The Ownership Recital

Both plaintiffs assert that a recital in the Contribution Agreement misled them into believing that they would jointly control Penfold with Manheim. The recital in question stated: "[E]ach of Parties is the record and beneficial owners of 1/3 of all of the share capital, securities, shares or other equity interests of any kind (collectively, Parties own 100% of Penfold) of Penfold." *Id.* at 1 (the "Ownership Recital"). The plaintiffs have stated a claim for fraud based on the Ownership Recital.

The plaintiffs contend that the Ownership Recital falsely implied that the three principals collectively would own the holding company and control it, yet under the actual Penfold structure, only Manheim and ReathCo serve as its general partners and have the ability to control it. According to the picture painted by the complaint, Ban and Bamford have not been given any meaningful rights in their capacities as limited partners of Penfold.

The Ownership Recital represents that the three principals—Ban, Bamford, and Manheim—will share equal ownership of all of the "equity interests of any kind" in the holding company. The Delaware Limited Partnership Act (the "LP Act") describes the equity interests in a limited partnership generally as the "partnership interest." 6 *Del. C.* §

36

17-101(15). The overarching partnership interest is then divided between the limited partners and the general partners or among different classes or groups of limited partners and general partners in accordance with the terms of the limited partnership agreement.[8] General partners and limited partners invariably have different governance rights, with the former having the general power to manage the entity or participate in its management and the latter having a more limited set of governance rights that typically encompasses the

---

[8] *See id.* §§ 17-302 & 17-405. Numerous authorities on limited partnerships discuss the division of the partnership interest into a general partnership interest and a limited partnership interest. *See, e.g.*, Sandra K. Miller & Karie Davis-Nozemack, *Toward Consistent Fiduciary Duties for Publicly Traded Entities*, 68 Fla. L. Rev. 263, 268–69 (2016); John Goodgame, *Master Limited Partnership Governance*, 60 Bus. Law. 471, 471–72 (2005); Robert W. Hamilton, *Corporate General Partners of Limited Partnerships*, 1 J. Small & Emerging Bus. L. 73, 97 (1997); Conrad E.J. Everhard, *The Limited Partnership Interest: Is It A Security? Changing Times*, 17 Del. J. Corp. L. 441, 446–52 (1992). Numerous cases reflect this division. *See, e.g.*, *Lawrence v. Cohn*, 932 F. Supp. 564, 567 (S.D.N.Y. 1996); *In re Asian Yard P'rs*, 1995 WL 1781675, at *1 (Bankr. D. Del. Sept. 18, 1995); *In re Integrated Res., Inc.*, 1990 WL 325414, at *2 (Bankr. S.D.N.Y. Oct. 22, 1990); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 172 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. 2015) (ORDER); *Natural Energy Dev., Inc. v. Shakespeare-One Ltd. P'ship*, 2013 WL 3809250, at *3 (Del. Ch. July 22, 2013); *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1012 (Del. Ch. 2010); *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 321 (Del. Ch. 1998); *Nuevo El Barrio Rehabilitacion De Vivienda y Economia, Inc. v. Moreight Realty Corp.*, 907 N.Y.S.2d 438, 2009 WL 5895336, at *1 (N.Y. Sup. Ct. Nov. 16, 2009) (TABLE) (subsequent history omitted); *How Small Can a Partner's Interest Be: Is 0.1% (Or 0.01%) the 'New' 1%?*, 114 J. Tax'n 186, 186 (2011); Michael L. Marchbanks, *How Should Dual Capacity Partners Be Treated for Income Tax Purposes?*, 8 J. P'ship Tax'n 146, 147 (1990). Although a limited partnership agreement often expressly divides the partnership interest into a limited partnership interest and a general partnership interest, the distinction exists regardless of any formal delineation. Given the structure of a limited partnership, and because of the inherent differences between limited partner and general partner rights under the LP Act, there will invariably be a *de facto* division.

right to vote on particular issues or transactions. Limited partners have some voting rights by default; others must be granted in the limited partnership agreement.[9]

The complaint supports a reasonable inference that the limited partners in Penfold effectively have no governance rights, while the general partners have all of the governance rights. It is reasonable to infer that for purposes of the Ownership Recital, the limited partnership interests and the general partnership interests in Penfold are different kinds of "equity interests." The Ownership Recital represented that Bamford, Ban, and Manheim would each own "1/3 of all of the . . . equity interests of any kind." It is reasonable to infer that the Ownership Recital was false because Bamford, Ban, and Manheim do not each own "1/3 of all of the . . . equity interests of any kind." Bamford, Ban, and Manheim each own one-third of the limited partnership interest, but Manheim and ReathCo own all of the general partnership interest. For the Ownership Recital to be correct, Bamford, Ban, and Manheim would have to each own one-third of the general partnership interest in addition to each owning one-third of the limited partnership interest.[10]

---

[9] *See* 6 *Del. C.* §§ 17-211(b), 17-216(b), 17-219(b), 17-302(f), 17-801(2).

[10] It is also reasonable to infer that the Ownership Recital was false because of its representation that Bamford, Ban, and Manheim would own all of the equity of the holding company. According to the complaint, Penfold has three limited partners (Bamford, Ban, and Manheim) and two general partners (Manheim and ReathCo). If Manheim and ReathCo own a portion of the partnership interest as general partners, then this leaves less than 100% of the partnership interest to be divvied up among Bamford, Ban, and Manheim as limited partners. It is therefore reasonable to infer that Bamford, Ban, and Manheim do not each own one-third of the partnership interest. It is true that a limited partnership agreement can admit limited partners or general partners who do not have a partnership interest, meaning that there is a theoretical state of the world in which the Ownership Recital could be accurate in this respect. *See* 6 *Del. C.* §§ 17-301(d) & 17-401(a). The

The defendants argue against an inference of fraud by arguing that the Ownership Recital only refers to economic rights and does not imply anything about management or governance rights. According to the defendants, the plain meaning of the terms used in the Ownership Recital—capital, securities, shares, and equity—all refer to an economic share in an entity without any other connotations. They argue that the plaintiffs received their due because as limited partners, they each receive a one-third interest in the economic returns of the holding company.

This argument construes the Ownership Recital too narrowly. Equity interests typically comprise a bundle of rights that includes both economic rights (like the right to receive dividends or distributions) and governance rights (like the right to vote). That fact is readily understood for shares of common stock in a corporation, which by default carry the economic rights to receive dividends and the value of the residual claim in dissolution while at the same time carrying governance rights that include the right to elect or remove directors, the power to amend bylaws, and the right to vote on major corporate changes, such as mergers, charter amendments, sales of all or substantially all assets, and

---

question at the pleading stage is not whether it is theoretically possible that the defendants might prevail, but rather whether it is reasonably conceivable that the plaintiffs have a claim. The plaintiffs are entitled to the reasonable inference at the pleading stage that the Penfold partnership agreement did not admit general partners who did not receive any of the partnership interest. The plaintiffs are therefore entitled to the reasonable inference at the pleading stage that the Ownership Recital was false when it represented that Bamford, Ban, and Manheim would own all of the equity of the holding company.

39

dissolution.[11] A representation that three individuals will own all of the shares of a corporation carries the connotation that they will jointly enjoy the benefit of its economic success and jointly control all of its voting power. A representation that three individuals will own all of the "equity interests of any kind" issued by the corporation would indicate that if the corporation issued a class of voting shares and a class of non-voting shares, then the individuals would collectively own both.

When drafting the Contribution Agreement, Manheim chose to frame the Ownership Recital using terms from the corporate context—capital, securities, shares, and equity. He further chose to make the representations that "collectively, Parties own 100% of Penfold" and that each own "1/3 of all of the . . . equity interests of any kind." It was reasonable for the plaintiffs to believe that Ban, Bamford, and Manheim collectively would own 100% of the equity of Penfold, with each having an equal ability to influence the direction of the entity by voting at the equity-holder level or otherwise exercising governance rights. For purposes of a limited partnership, Ban and Bamford could reasonably infer that together, they would own 66 2/3% of the limited partnership interest and 66 2/3% of the general partnership interest. At a minimum, as the holders of two-thirds of the entity's s voting power, they would be able to exercise meaningful governance rights.

---

[11] *See, e.g.*, 8 *Del. C.* § 109(a) (bylaws); *id.* § 141(k) (removal of directors); *id.* § 216(2) (electing directors); *id.* § 242(b)(1) (amendments to the certificate of incorporation); *id.* § 251(c) (mergers); *id.* § 275(b) (dissolution).

Instead, according to the complaint, they found themselves locked into Penfold as limited partners without any meaningful governance rights.

The complaint thus supports a reasonable inference that the Ownership Recital was false. It can provide the basis for a claim of common law fraud.

### 4. The Plaintiffs' Claim That Manheim Remained Silent In The Face Of A Duty To Speak

Ban and Bamford both contend that when asking them to go along with the Reorganization, Manheim "failed to disclose material facts that he was under a legal obligation to disclose." Compl. ¶¶ 173, 180. Both assert that Manheim failed to disclose "that the real purpose behind the agreement was to ensure that Manheim would have full control over the DVRC Entities" and that if Ban and Bamford "entered into the [Contribution Agreement and related documents], [their] economic, voting, and other rights would be harmed." *Id*. Ban additionally contends that Manheim failed to disclose that "he would unilaterally create the structure for his own benefit." *Id*. ¶ 180. Bamford contends that Manheim failed to disclose "that Manheim had previously set up Penfold and made himself and [ReathCo] the only general partners." *Id.* ¶ 173.

"Generally, a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure." *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007); *see Matthews Office Designs, Inc. v. Taub Invs.*, 647 A.2d 382, 382 (Del. 1994) (TABLE). At the time of the Reorganization, Manheim owed fiduciary duties to Bamford and Ban in multiple capacities. First, in his role as

Bamford's trusted financial and business advisor and close friend, Manheim was a fiduciary for Bamford personally. *See* Part II.A, *supra.* Second, as a director of WestCo, Manheim owed a duty to provide full information to Bamford and Ban in their capacities as fellow members of the WestCo Board.[12] Third, as an officer of DVRC, Manheim owed a duty to provide full information to Bamford and Ban in their capacities as members of the WestCo Board.[13] Fourth, as the party that controlled WestCo, the managing member of

---

[12] *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996) (holding that where directors were approached about a purchase of a corporate asset, they "should have informed the CERBCO board" and "breached [their] duty of loyalty" by not informing their fellow directors); *In re Emerging Commc'ns Inc. S'holders Litig.*, 2004 WL 1305745, at *34 (Del. Ch. May 3, 2004, revised June 4, 2004) (holding that "[f]or [a director] to have participated in the board's . . . deliberations [on a transaction] and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to [his] fellow directors and a breach of his fiduciary duty owed to them and to ECM"); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (holding that director "violated his fiduciary duty of loyalty by, among other acts . . . misleading his fellow directors about his conduct and failing to disclose his dealings with the Barclays, under circumstances in which full disclosure was obviously expected"); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (explaining that directors have an "unremitting obligation to deal candidly with their fellow directors" (internal quotation marks omitted)); *Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988) ("The intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, itself constitutes a wrong . . . ."); *see also* Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 5.02(a)(1) cmt. (1994) ("A director or senior executive owes a duty to the corporation not only to avoid misleading it by misstatements and omissions, but affirmatively to disclose the material facts known to the director or senior executive.").

[13] *See Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) (holding that chairman and CEO breached his fiduciary duty through "knowing concealment" of information "at the critical board meeting" in light of the "duty of disclosure under the circumstances"); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del. Ch. 2016) ("Officers also have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles."), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Bomarko, Inc. v. Int'l*

DVRC, Manheim owed a fiduciary duty to Bamford and Ban as members of DVRC. *See*

*USACafes*, 600 A.2d at 48.

The parties dispute what information Manheim had a duty to disclose. Both sides

analogize to standards used for directors of a corporation where the "scope and

requirements" of the duty to disclose "depend on context." *In re Wayport, Inc. Litig.*, 76

A.3d 296, 314 (Del. Ch. 2013).

The plaintiffs argue that the Reorganization was analogous to "a request for

stockholder action," *i.e.* "[w]hen directors submit to the stockholders a transaction that

requires stockholder approval (such as a merger, sale of assets, or charter amendment) or

which requires a stockholder investment decision (such as tendering shares or making an

appraisal election)." *Id.* In that setting, directors have a duty to "exercise reasonable care

---

*Telecharge, Inc.*, 794 A.2d 1161, 1187 (Del. Ch. 1999) (observing that corporation had a "strong claim" against Chairman and CEO for failing to disclose his interest in a transaction to the board); *see also In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 760 (Del. Ch. 2005) (criticizing CEO for failing to keep directors informed about hiring and termination of president), *aff'd*, 906 A.2d 27 (Del. 2006); *cf. Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *34 (Del. Ch. July 12, 2010) ("[W]hen a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty."); *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007) (holding that complaint stated claim for breach of the duty of loyalty against CFO and vice president who knew about backdating but "kept silent"). *See generally Restatement (Third) of Agency* § 8.11 (Am. L. Inst. 2006) (describing agent's duty to provide principal with facts that the agent knows); Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L.Rev. 1187, 1191–1208 (2003) (discussing duty of candor for officers under agency principles and corporate law).

to disclose all facts that are material to the stockholders' consideration of the transaction . . . ." *Id.* (internal quotation marks omitted). "'An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.'" *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976)); *accord Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

Manheim argues that the Reorganization was analogous to a situation in which "a corporate fiduciary buys shares directly from or sells shares directly to an existing outside stockholder." *Wayport*, 76 A.3d at 315. In that scenario, a director has a fiduciary duty to disclose information in the context of a private stock sale "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them." *Lank v. Steiner*, 224 A.2d 242, 244 (Del. 1966); *see Wayport*, 76 A.3d at 315.

Given the different fiduciary capacities in which Manheim acted, it is not clear to me that a director's duty to disclose information to stockholders provides the appropriate legal analogy. But accepting the parties' framework for purposes of this decision, the Reorganization is analogous to a request for stockholder action. By asking the plaintiffs to participate in the Reorganization, Manheim asked the plaintiffs to exchange their equity interests in DVRC for equity interests in Penfold. That transaction was comparable to an

exchange offer, which constitutes a request for stockholder action where the duty to disclose all material information applies.[14]

Under that standard, it is reasonable to infer that the governance structure of Penfold was material information. A reasonable investor in Bamford and Ban's position would have considered it important to know that Manheim would control Penfold and through it, DVRC. A reasonable investor in Bamford and Ban's position would also have considered it important to know that they would not own any of the general partnership interest in Penfold or have any influence over the identity of the general partner.[15]

The Reorganization is not analogous to a direct purchase of shares where the special facts doctrine would apply. Manheim did not offer to buy the plaintiffs' interests in DVRC. Had he done so, then the stark context of that scenario would have made clear to the

---

[14] *See, e.g., Gradient OC Master, Ltd. v. NBC Universal Inc.*, 930 A.2d 104, 129 (Del. Ch. 2007) (explaining that duty of disclosure applies when a board requests stockholder action, as when making a recommendation in connection with an exchange offer); *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326, at *5 (Del. Ch. Dec. 4, 1990) (explaining that "[t]he state law duty of candor arises when the board elects to or has a duty to seek shareholder action" and identifying as an example "in a tender offer or exchange offer"); *see also Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009) (analyzing claim for breach of duty of disclosure in connection with exchange offer).

[15] The defendants argue that the disclosures the plaintiffs seek would amount to self-flagellation, which Delaware law does not require. The complaint frames the omitted facts tendentiously, but the allegations boil down to a claim that Manheim failed to inform the plaintiffs about the governance structure of Penfold, including the fact that he would control the entity and that they would not have any governance rights. That is factual information that could have been disclosed in neutral terms. It did not require self-flagellation. It might not have reflected well on Manheim, but that is only because (according to the complaint) he was radically changing the governance structure of the entity in a self-interested manner and to the detriment of his business partners.

45

plaintiffs that Manheim had shifted into an adversarial posture and was bargaining at arm's length such that they could not expect him to be acting collaboratively as their trusted business partner and long-time fiduciary. Rather than proceeding openly in that fashion, Manheim portrayed the Reorganization as a change in the form of their business relationship but not its substance. At the pleading stage, nothing about the transaction appears likely to have put the plaintiffs on notice that Manheim had shifted into an adversarial mode. Instead, the allegations of the complaint suggest that Manheim encouraged the plaintiffs' trust and took advantage of it. The special facts doctrine therefore does not apply.

Manheim also contends any disclosures about his control over Penfold were unnecessary because Penfold's certificate of limited partnership was filed publicly with the Delaware Secretary of State on March 18, 2016. *See* Dkt. 91 Ex. A. It listed ReathCo as Penfold's only general partner. *Id.* Manheim contends that "[i]t obviously is not fraud to fail to disclose material information that one's own investigation from public sources provides." *Citron v. Steego Corp.*, 1988 WL 94738, at *7 (Del. Ch. Sept. 9, 1988).

The certificate of limited partnership did not put the plaintiffs on notice that Manheim planned to assert full control over Penfold while depriving them of any governance rights. To create a limited partnership, the certificate of formation must name a general partner. *See* 6 *Del. C.* § 17-201(a)(3). The plaintiffs thus reasonably could have inferred that Manheim named ReathCo as Penfold's general partner to facilitate the creation of the entity. Nothing about Penfold or its general partner was written in stone. After the Reorganization, which took place three months later, Manheim could have

46

fulfilled the commitments he made orally and in the Ownership Recital by issuing interests in ReathCo to the plaintiffs so that Manheim, Ban, and Bamford each owned one-third of the equity and governance rights in that entity. Or the parties could have agreed in Penfold's limited partnership agreement to replace ReathCo with a different general partner that they would own equally, or with themselves individually as general partners. *See id.* § 17-401(b). If the identity of the general partner changed, then the parties simply would have had to file an amended certificate of formation. *See id.* § 17-202. Other possible avenues doubtless existed. What matters for present purposes is that the contents of Penfold's original certificate of formation did not pre-emptively satisfy Manheim's duty of disclosure.

Manheim also argues that the plaintiffs' duty-to-speak claims are nothing more than a re-framing of their affirmative claims for fraud and should be dismissed on that ground. *See Prairie Capital*, 132 A.3d at 52. Although there is some overlap, there are also arguable differences. In any event, the plaintiffs can plead in the alternative. *See* Ch. Ct. R. 8(a).

The plaintiffs have pled adequately that Manheim engaged in fraud by failing to disclose material facts that he was under a legal obligation to disclose. The motion to dismiss this aspect of the fraud claim is denied.

### 5.    Damages

In his last argument for dismissal, Manheim contends that the plaintiffs failed to plead damages with particularity. Even when a plaintiff asserts a fraud claim, damages do not have to be pled with particularity. What has to be pled with particularity are "the circumstances constituting fraud or mistake." Ch. Ct. R. 9(b). Unless a complaint seeks

47

special damages, damages can be pled generally. Ch. Ct. R. 9(g). A plaintiff must plead some harm, but "[p]roof of . . . damages and of their certainty need not be offered in the complaint in order to state a claim." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003).

The complaint adequately pleads that the plaintiffs suffered harm as a result of Manheim's fraud. Ban pleads that he lost compensation that was instead characterized as a loan, and he is now facing a claim by DVRC to recover the loan. Ban and Bamford plead that they entered into the Reorganization, thereby giving up membership interests in DVRC that they otherwise would possess today. This is sufficient.

### 6. The Plaintiffs Have Stated Claims For Common Law Fraud.

Counts VIII and IX state claims for common law fraud. The defendants' motion to dismiss these claims is denied.

## C. Counts XI And XII: The Plaintiffs' Personal Claims Against Manheim For Negligent Misrepresentation

In Counts XI and XII of the complaint, Bamford and Ban restate their claims for common law fraud as claims for negligent misrepresentation. A claim for negligent misrepresentation must satisfy all of the elements of a claim for common law fraud, except that it substitutes negligence for *scienter*. Donald W. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.03[b][1][iii], at 2-36 to -37 (2d ed. 2019) (collecting authorities). The particularity

requirement of Rule 9(b) applies equally to a claim for negligent misrepresentation. *See Otto Candies, LLC v. KPMG LLP*, 2019 WL 994050, at *7 (Del. Ch. Feb. 28, 2019).

Under Delaware law, the threshold requirement for a claim of negligent misrepresentation is the existence of either "(i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for a remedy that only equity can afford." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015). This decision has explained that when speaking (or failing to speak) in connection with the Reorganization, Manheim was acting as a fiduciary. *See* Part II.B.4, *supra*. The claims for common law fraud relating to the Reorganization survived dismissal, and the element of *scienter* did not play a meaningful role in the analysis. The analysis is therefore the same for the claims for negligent misrepresentation that relate to the Reorganization. As to those claims, the motion to dismiss Counts XI and XII is denied.

The outcome is different for Ban's claim of fraud against Manheim based on his compensation. Ban did not articulate any reason to think that Manheim was acting as a fiduciary for Ban when convincing him to treat his compensation as a loan, nor is there any reason to believe that a special equitable remedy (as opposed to damages) is required to make Ban whole. Count XII is therefore dismissed to the extent it addresses Ban's compensation.

### D. Count VI: The Plaintiffs' Personal Claims For Conversion

In Count VI, the plaintiffs claim that Manheim wrongfully converted the plaintiffs' membership interests in DVRC. This count states a claim on which relief can be granted.

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it." *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933); *accord Arnold v. Soc'y for Saving Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996). The types of property that can be converted include intangible property like shares of stock.[16]

The defendants contend that membership interests in an LLC are different and cannot be converted. That assertion runs contrary to a prior decision of this court, which held that a defendant engaged in conversion by exercising unlawful dominion over the membership interests in an LLC. *See Perry v. Neupert*, 2019 WL 719000, at *24–25 (Del. Ch. Feb. 15, 2019). It also runs contrary to the broader trend in the treatment of intangible property.

> It was first held that the conversion of a document in which intangible rights were merged permitted recovery of damages for the appropriation of the rights so identified with it . . . . Then . . . it came to be recognized by a number of courts that the recovery was for the interference with the intangible rights themselves, and that the conversion of the document was merely the means by which this was accomplished. The final step, which a good many courts have taken, was the recognition that there may be "conversion" of such an

---

[16] *See Mastellone v. Argo Oil Corp.*, 82 A.2d 379, 382–83 (Del. 1951); *Drug*, 168 A. at 93; *cf. Payne v. Elliot*, 54 Cal. 339, 342 (Cal. 1880) ("It is, therefore, the 'shares of stock' which constitute the property which belongs to the shareholder. Otherwise, the property would be in the certificate; but the certificate is only evidence of the property; and it is not the only evidence, for a transfer on the books of the corporation, without the issuance of a certificate, vests title in the shareholder: the certificate is, therefore, but additional evidence of title, and if trover is maintainable for the certificate, there is no valid reason why it is not also maintainable for the thing itself which the certificate represents.").

intangible right, of a kind customarily identified with and merged in a document, even though the document is not itself converted.[17]

Today, a party engages in conversion if he "effectively prevents the exercise of intangible rights of the kind customarily merged in a document," whether or not "the document is . . . itself converted." *Restatement (Secod) of Torts* § 242(2).

There is no basis for treating a share of stock in a corporation and a membership interest in an LLC differently for purposes of conversion. A share of stock represents a bundle of rights defined by the laws of the chartering state and the corporation's certificate of incorporation and bylaws. A membership interest in an LLC represents a bundle of rights defined by the laws of the chartering state, any substantive provisions in the certificate of formation (typically none), and the LLC agreement. Just as a share of stock is subject to conversion, so too is a membership interest in an LLC.

"A conversion may be committed by intentionally . . . dispossessing another of a chattel . . . ." *Id.* § 223(a). "A dispossession may be committed by intentionally . . . obtaining possession of a chattel from another by fraud or duress . . . ." *Id.* § 221(b). "Assent to the actor's taking possession of the chattel given under such circumstances is ineffectual to constitute a consent to the taking." *Id.* cmt. d.

---

[17] *Restatement (Second) of Torts* § 242 cmt. e (Am. L. Inst. 1965); *see Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21 1995) ("Following a modern trend, Delaware courts have tentatively expanded the doctrine to encompass some intangible goods where the intangible property relations are merged into a document."); *cf. Fremont Indem. Co. v. Fremont Gen. Corp.*, 55 Cal. Rptr. 3d 621, 638 (Cal. App. Ct. 2007) (recognizing conversion of net operating loss).

The plaintiffs allege that Manheim obtained their membership interests in DVRC through fraud. As discussed above, the plaintiffs have stated claims for fraud in connection with the Reorganization. Therefore, the complaint states a claim against Manheim for conversion. The motion to dismiss as to Count VI is denied.

**E.      Count II: The Plaintiffs' Double-Derivative Claim For Breach Of Fiduciary Duty On Behalf Of DVRC**

In Count II, the plaintiffs seek on behalf of DVRC to recover from Manheim and WestCo. They contend that Manheim and WestCo breached their fiduciary duties by engaging in interested transactions and otherwise harming DVRC. Manheim and WestCo contend that the plaintiffs lack standing to assert a derivative claim on DVRC's behalf.

The standing argument turns on the implications of the Reorganization. Count II challenges conduct that occurred both before the Reorganization and after the Reorganization. The analysis differs depending on when the conduct took place.

### 1.      Conduct Before The Reorganization

Manheim and WestCo contend that the plaintiffs lack standing to bring claims on behalf of DVRC for conduct that occurred before the Reorganization because they are no longer members of DVRC. This argument fails because the plaintiffs have double-derivative standing to assert these claims. Put differently, they can sue on behalf of Penfold to have Penfold assert these claims on behalf of DVRC.

#### a.      Penfold's Statutory Standing

As a member of DVRC, Penfold has standing to assert claims derivatively on behalf of DVRC. Section 18-1002 of the Delaware Limited Liability Company Act (the "LLC

52

Act") requires that "[i]n a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action." 6 *Del. C.* § 18-1002. For purposes of the claims asserted in this litigation, Penfold was a member of DVRC at the time of the bringing of the action, easily satisfying the requirement.

The complexity for purposes of this case arises because of the alternative entity version of the contemporaneous ownership requirement.[18] Section 18-1002 states that in

---

[18] The contemporaneous ownership requirement arose as a limitation on the ability of stockholders to bring derivative actions on behalf of corporations. Delaware had long rejected the contemporaneous ownership requirement, consistent with the common law rule in a majority of jurisdictions. *See Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 110–11 (Del. Ch. 1948). *See generally Activision*, 124 A.3d at 1046–49; *Quadrant I*, 102 A.3d at 177–82. In 1945, the Delaware General Assembly established the contemporaneous ownership requirement by enacting what is now Section 327 of the Delaware General Corporation Law, 8 *Del. C.* § 327, which remains the only section of the DGCL that addresses derivative actions. Commentators from the nineteen century until the present day have criticized the contemporaneous ownership requirement as illogical and inconsistent with the policy rationales that have been advanced to support it. *See, e.g.*, Robert C. Clark, *Corporate Law* § 15.4, at 651 (1986); 2 George D. Hornstein, *Corporation Law & Practice* § 712, at 195 (1959); Henry Winthrop Ballantine, *Ballantine on Corporations* § 148, at 352–53 (rev. ed. 1946); 6 Seymor D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 4638, at 538 (3d ed. 1927); 1 Victor A. Morawetz, *The Law of Private Corporations* § 266, at 253–54 (2d ed. 1886); *see also* Note, *Corporations—Uniform Stock Transfer Act—Effect on Minnesota Law—Negotiability of Shares—Right of Subsequent Transferee to Sue*, 23 Minn. L. Rev. 484, 488 n.30 (1939) (explaining that "a subsequent transferee of shares in a corporation should be able to maintain a derivative suit" and observing that "[t]his appears to be the majority position"); Note, *Stockholder's Suit for Wrong Which Occurred Before Complainant Acquired Stock*, 68 U.S. L. Rev. 169, 169 (1934) (noting that "[i]n most of the jurisdictions in which the question has been presented, it has been held that in the absence of special circumstances a stockholder's suit may be brought by one who was not a stockholder at the time of the transaction of which he complains"); *see id.* at 172–75 (drawing on reasoning of cases to criticize contemporaneous ownership requirement). Although I respect that the General Assembly has imposed the contemporaneous ownership requirement by statute, and it therefore reflects the law of Delaware that I am bound to apply, my sympathies lie with the critics.

addition to being a member or an assignee at the time of bringing the action, the plaintiff must either have been a member or assignee

> (1) [a]t the time of the transaction of which the plaintiff complains; or
>
> (2) [t]he plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of the limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.

6 *Del. C.* § 18-1002. The defendants observe that for conduct that predated the Reorganization, Penfold was not and could not have been a member of DVRC when the challenged transactions took place. Penfold did not exist until March 2016, and it did not become a member of DVRC until June of that year.

---

*See generally* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008)

    A provocative article suggests that the statutory limitations on corporate derivative actions that legislatures adopted in the mid-twentieth century may have their roots in anti-Semitism. *See generally* Lawrence E. Mitchell, *Gentleman's Agreement: The Antisemitic Origins of Restrictions on Stockholder Litigation*, 36 Queen's L.J. 71 (2010). In 1944, the New York legislature adopted a suite of statutory limitations on derivative actions that included a security-for-expenses requirement and a contemporaneous ownership requirement. *See id.* at 72 & n.1. Professor Mitchell has argued that the legislation was influenced by the anti-Semitic prejudices of the predominantly non-Jewish defense bar and their reaction to the perceived prevalence with which predominantly Jewish lawyers represented plaintiffs in stockholder derivative actions challenging the corporate establishment. The New York initiative had widespread influence, as "[p]assage of the New York statute inspired a burst of heated attacks on the derivative suit as an abusive and corrupt device from supporters of business interests throughout the country." Donna I. Dennis, *Contrivance and Collusion: The Corporate Origins of Shareholder Derivative Litigation in the United States*, 67 Rutgers U. L. Rev. 1479, 1520 (2015). Delaware notably did not adopt a security-for-expenses statute, but it seems likely that the 1945 enactment of Section 327 was spurred by the New York initiative.

Under Section 18-1002(2), however, Penfold has standing to assert derivative claims on behalf of DVRC based on conduct that predated the Reorganization because Penfold became a member of DVRC "pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction." Bamford, Ban, and Manheim were members of DVRC from 2012 until the Reorganization. They accordingly were members "at the time of" the pre-Reorganization transactions that are challenged in Count II. Penfold became a member after Bamford, Ban, and Manheim contributed their membership interests to Penfold under the Contribution Agreement, making Penfold at least an assignee of their membership interests. Manheim structured the Reorganization, so it is reasonable to infer that the contribution took place "pursuant to the terms of [DVRC's] limited liability company agreement." *See Flynn v. Bachow*, 1998 WL 671273, at \*1 (Del. Ch. Sept. 18, 1998) (interpreting analogous provision in the Delaware Limited Partnership Act as requiring plaintiff to have "acquired a partnership interest from a person who was a partner at the time of the transaction"); Martin I. Lubaroff et al., *Lubaroff & Altman on Delaware Limited Partnerships* § 10.02, at 10-18 (2d ed. 2020) (same). Penfold thus has standing to assert derivative claims on behalf of DVRC.

"'Any claim belonging to the [entity] may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve [entity]

mismanagement or breach of fiduciary duty."[19] One of the claims belonging to Penfold is its right to sue derivatively on behalf of DVRC. A party that has standing to sue derivatively on behalf of Penfold in turn has standing to cause Penfold to assert derivative claims on behalf of DVRC.

### b.     The Plaintiffs' Statutory Standing

To be able to sue derivatively on behalf of Penfold, Ban and Bamford must meet the requirements of Section 17-1002 of the LP Act. Those requirements track Section 18-1002 of the LLC Act and state:

> In a derivative action, the plaintiff must be a partner or an assignee of a partnership interest at the time of bringing the action and:
>
> (1)  At the time of the transaction of which the plaintiff complains; or
>
> (2)  The plaintiff's status as a partner or an assignee of a partnership interest had devolved upon the plaintiff by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner or an assignee of a partnership interest at the time of the transaction.

6 *Del. C.* § 17-1002. Like Penfold, Bamford and Ban were partners "at the time of bringing the action." The debate surrounds the second requirement, which necessitates that they either (i) have been partners "[a]t the time of the transaction of which the plaintiff

---

[19] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999)); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 13.10, at 13-26 (3d ed. 2020) (explaining that a derivative action can be used to assert any "corporate right that the corporation has refused for one reason or another to assert"); *see Urdan*, 2019 WL 3891720, at *8–11 (discussing historical development of derivative actions).

complains" or (ii) have received their interest "by operation of law" or "pursuant to the terms of the partnership agreement" from "a person who was."

The Delaware Supreme Court has held that when an investor in a parent entity seeks to litigate derivative claims on behalf of its subsidiary, and when an intervening transaction and the strict operation of the contemporaneous ownership requirement would cut off the ability of parent investors to sue, then the wrong for purposes of analyzing the contemporaneous ownership requirement at the parent-entity level is the failure of the parent to cause the subsidiary to assert its claims. *See Lambrecht v. O'Neal*, 3 A.3d 277, 283 (Del. 2010). In that setting, the analysis does not require comparing when the investor in the parent entity acquired its interest with when the subsidiary's claim arose. *Id.*

The *Lambrecht* decision addressed the ability of a stockholder of a parent corporation to assert double-derivative claims on behalf of the parent corporation's wholly owned subsidiary. The subsidiary's claims indisputably arose before the stockholder acquired its shares in the parent corporation, so if the contemporaneous ownership requirement required measuring the subsidiary's claims against the point when the parent stockholder acquired its shares, then the parent stockholder would not have had standing. The Delaware Supreme Court nevertheless held that the stockholder could sue derivatively to cause the parent entity to assert its subsidiary's claim, reasoning that "[o]therwise there would be no procedural vehicle to remedy the claimed wrongdoing in cases where the parent company board's decision not to enforce the subsidiary's claim is unprotected by the business judgment rule." *Id.* The Delaware Supreme Court thus evaluated the parent-

level wrong as the parent's failure (or inability) to cause the subsidiary to assert the claim. *See id.*

The prerequisites for the rule in *Lambrecht* apply in this case. Bamford, Ban, and Manheim are the only human beings with equity interests in Penfold. Manheim will not sue himself, nor will he cause ReathCo (which he controls) to bring suit. As a result, if Bamford and Ban lack standing to sue, then there will be "no procedural vehicle to remedy the claimed wrongdoing." *Id.*[20]

The Delaware Supreme Court's decision in *Lambrecht* was ultimately a pragmatic and policy-driven decision that took a realistic and practical approach to double-derivative actions. *See Hamilton P'rs v. Englard*, 11 A.3d 1180, 1205 (Del. Ch. 2010). It is thus worth noting that just as the principal policy rationale from *Lambrecht* applies fully in this case

---

[20] The defendants have not meaningfully attempted to invoke Rule 23.1, implicitly recognizing that making demand on Manheim and ReathCo would have been futile. In a single sentence in their reply brief, the defendants asserted that "though the Complaint alleges in broad strokes that 'Manheim, [WestCo] and [ReathCo] are incapable of making an independent and disinterested decision to investigate the allegations contained herein,' there are no allegations setting forth DVRC's or [WestCo's] governance structures or why it would be futile to make a demand on Penfold to demand that DVRC's managing member brings Counts II and V on behalf of DVRC." Dkt. 133 at 4 (citation omitted). To the contrary, the complaint pleads facts supporting a reasonable inference that Manheim controls ReathCo and WestCo, making demand futile.

In another by-the-way argument in their reply brief, the defendants objected to the plaintiffs' ability to sue derivatively because the "[p]laintiffs have not filed an affidavit in accordance with Rule 23.1(b) in their capacity as a representative plaintiff on behalf of DVRC (or Penfold)." Dkt. 133 at 4 n.4. The plaintiffs have leave to cure this procedural oversight. If they fail to do so, then the defendants can renew their motion for dismissal on that basis.

(otherwise no one could sue), it is equally true that none of the policy reasons that have been cited traditionally to support the contemporaneous ownership requirement apply on these facts. Delaware courts have most often asserted that the contemporaneous ownership requirement exists to "'to prevent what has been considered an evil, namely the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock.'" *Schoon v. Smith*, 953 A.2d 196, 203 (Del. 2008) (quoting *Burry Biscuit*, 60 A.2d at 111). That concern does not apply here. Ban and Bamford owned 60% of the equity in DVRC before the Reorganization and could sue derivatively for any wrongs. After the Reorganization, they still beneficially own 60% of the equity in DVRC, yet the defendants say they cannot sue derivatively for any wrongs. They have not bought into a lawsuit.

The more recent justification for the contemporaneous ownership requirement that Delaware courts have offered is the goal of preventing "strike suits." *See* Laster, *supra*, at 688–91. This case is not a strike suit. It attacks self-dealing conduct by Manheim and entities that he controls. Not surprisingly, the defendants have not made any meaningful effort to dismiss the claims on the merits.

Under the statutory provisions of the LP Act and the principles articulated in *Lambrecht*, Ban and Bamford have standing to sue derivatively on behalf of Penfold to cause it to assert the claims that it can bring derivatively on behalf of DVRC. The plaintiffs

59

thus have standing to assert double-derivative claims for misconduct that preceded the Reorganization.[21]

### c. Double-Derivative Actions For Alternative Entities

In a Hail Mary argument, Manheim and WestCo posit that Delaware law does not recognize double-derivative actions in the alternative entity space. There is no authority to support that counter-intuitive proposition. Instead, this court has held that an investor in an entity that was a member of an LLC could assert a double-derivative claim on behalf of the LLC. *See Reid v. Siniscalchi*, 2014 WL 6589342, at *13 (Del. Ch. 2014). The United States District Court for the Southern District of New York similarly concluded that an investor in an entity that was a limited partner in a Delaware limited partnership could assert a double-derivative claim on behalf of the limited partnership. *See Yale M. Fishman 1998 Ins. Trust v. Phila. Fin. Life Assurance Co.*, 2016 WL 2347921, at *4 (S.D.N.Y. May 3, 2016). The leading treatise on the LLC Act does not suggest any limitation on double-derivative claims and cites *Reid* with approval. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* §§ 5.19[D], 9.09 & n.303 (2d ed. & Supp. 2019). Another treatise notes that Delaware "recognizes double

---

[21] *Lambrecht* involved a wholly owned subsidiary, and the Delaware Supreme Court has cautioned that it has never ruled on whether a plaintiff has double-derivative standing when the parent entity does not own 100% of the subsidiary. *See Lambrecht*, 3 A.2d at 283 n.14. In this case, Penfold owns 90% of the membership interests in DVRC, making this issue potentially pertinent. The parties, however, did not raise it, so this decision does not address it.

derivative actions involving limited partnerships." 2 William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors* § 18.01 n.46 (8th ed. 2019).

The foundation (and sole support) for the defendants' argument against double-derivative actions in the alternative entity space is *CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011), a decision that did not address double-derivative actions. *Bax* addressed whether a creditor of an insolvent LLC had standing to assert a derivative claim. *Id.* at 1041. Reading Section 18-1002 narrowly, the high court held that a creditor of an insolvent LLC was neither a member nor an assignee and therefore lacked standing to sue. *Id.* The *Bax* decision has no implications for the current case, where the double-derivative claim satisfies the statutory requirements of both Section 18-1002 of the LLC Act and Section 17-1002 of the LP Act.

The defendants further argue that the plaintiffs cannot invoke double-derivative standing because their complaint did not articulate that legal theory. "So long as claimant alleges facts in his description of a series of events from which [a claim] may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using." *Michaelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). In this case, the complaint alleges that the plaintiffs are limited partners of Penfold and that Penfold holds a membership interest in DVRC. From those allegations, it may reasonably be inferred that the plaintiffs have double-derivative standing.

### d. An Alternative-Entity Version Of The Continuous Ownership Requirement

The defendants further argue that the plaintiffs' claims fail to clear the continuous ownership requirement, an additional common law hurdle that Delaware has imposed on stockholders seeking to sue derivatively. The Delaware Supreme Court established this requirement in 1984 by stating expansively that "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at [the] time of commencement of suit but that he must also maintain shareholder status throughout the litigation." *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984). Applying this rule after the closing of a reverse triangular merger in which the stockholder plaintiffs had their shares converted into shares of the acquiring company, the Delaware Supreme Court held that "a corporate merger destroys derivative standing of former shareholders of the merged corporation from instituting or pursuing derivative claims" that were the property of the acquired company. *Id.* at 1047. The high court later restated the rule as follows: "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Id.* at 1049.[22] The Delaware Supreme Court has applied this

---

[22] A close look at the citations in *Lewis v. Anderson* suggests that the Delaware Supreme Court's formulation drew on an expansive paraphrasing of the longstanding common law rule that the right to assert a derivative claim is a property right associated with the plaintiff's shares of stock that passes to a buyer of the shares if the plaintiff sells. Chancellor Seitz applied this settled rule in *Hutchinson v. Bernhard*, 220 A.2d 782 (Del. Ch. 1965), agreeing that the plaintiff lost standing to sue derivatively when she voluntarily sold her shares to a third-party buyer because the right to sue passed with the shares. *Id.* at 783–84. Citing *Hutchinson*, the district court in *Heit v. Tenneco, Inc.*, 319 F. Supp. 884 (D. Del. 1970), reframed the rule more broadly: "Under Delaware law, a plaintiff, bringing a derivative suit on behalf of a corporation, must be a stockholder of the corporation at the

rule to limited partnerships and presumably would apply it to LLCs. *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016).

When creating the continuous ownership requirement, the Delaware Supreme Court also recognized two exceptions to it, both of which apply in this case. *See Lewis v. Anderson*, 477 A.2d at 1046 n.10. One is the reorganization exception, which applies when the transaction that otherwise would deprive the plaintiffs of standing "is essentially a reorganization that does not affect the plaintiff's relative ownership in the post-merger enterprise." *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013). Like the continuous ownership requirement itself, the reorganization exception has been discussed most often in the context of mergers, but nothing about the rationale for the exception limits it to that context. It can apply to any transaction that amounts to little more than a "corporate reshuffling" of ownership interests. *Lewis v. Ward*, 852 A.2d 896, 904 (Del. 2004); *see Schreiber v. Carney*, 447 A.2d 17, 22 (Del. Ch. 1982).

---

time he commences the suit and must maintain that status throughout the course of the litigation." *Id.* at 886. The Court of Chancery adopted *Heit*'s broader framing in *Harff v. Kerkorian*, 324 A.2d 215 (Del. Ch. 1974), stating: "But Delaware law seems clear that stockholder status at the time of the transaction being attacked and throughout the litigation is essential." *Id.* at 219 (citing *Hutchison* and *Heit*)), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975). The trial court decision in *Lewis v. Anderson* followed *Harff* and *Heit*'s paraphrasing of *Hutchinson*, expressing the rule as follows: "Stated as a general principle it is well established under Delaware law that a plaintiff bringing a derivative suit on behalf of a corporation must be a stockholder of the corporation at the time that he commences the suit and that he must maintain that status throughout the course of the litigation." *Lewis v. Anderson*, 453 A.2d 474, 476 (Del. Ch. 1982) (citing *Heit, Harff*, and *Hutchison*)) (subsequent history omitted). On appeal, the Delaware Supreme Court adopted the trial court's statement of the law, thereby generating what is now known as the continuous ownership requirement. *Lewis v. Anderson*, 477 A.2d at 1041, 1046.

The Reorganization was the epitome of a corporate reshuffling. The only parties to the Reorganization were Penfold, a newly formed holding company, and Bamford, Ban, and Manheim. Before the Reorganization, Penfold was a shell without any assets or operating business. After the Reorganization, Penfold held only the membership interests that Manheim, Ban, and Bamford contributed to it. According to Manheim's representations to the plaintiffs, no one's economic interests changed. Bamford, Ban, and Manheim went from a situation in which they each held a 30% interest in DVRC to a situation in which they each held a one-third interest in an entity holding a 90% interest in DVRC. The reshuffling of their ownership stake from a direct interest to an indirect interest should not prevent them from pursuing claims that they previously possessed and could assert. *See Helfand v. Gambee*, 136 A.2d 558, 562 (Del. Ch. 1957). The reorganization exception therefore applies.

The second exception recognized in *Lewis v. Anderson* applies when a plaintiff loses standing based on a "merger [that] itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action." *Countrywide*, 75 A.3d at 894. Although some decisions have interpreted the adverb "merely" to mean that the exclusive purpose of the transaction must be to deprive stockholders of standing, such a cabined approach would deprive the exception of any efficacy. The exception applies when "a principal purpose" of the transaction is the elimination of standing to assert derivative claims" *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 763 (Del.Ch.1986); *see Brinckerhoff v. Texas E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 383 (Del. Ch. 2010). As with the reorganization exception, the fraud exception

has been discussed in the context of mergers, but the broader principle is not limited to that species of transaction.

In this case, the plaintiffs have pled successfully that Manheim fraudulently induced them to contribute their membership interests to DVRC. Manheim was a sophisticated individual who had engaged in interested transactions involving DVRC and who intended to continue that practice more aggressively after the Reorganization. It is reasonable to infer that Manheim understood that the Reorganization would interfere with the plaintiffs' ability to bring derivative claims and that he pursued the Reorganization, at least in part, for that reason. The complaint calls into question Manheim's other justifications for the Reorganization, making it reasonable to infer at the pleading stage that interfering with the plaintiffs' ability to bring derivative claims was a principal reason for Manheim's pursuit of the Reorganization. The fraud exception therefore applies.

The defendants finally contend that the plaintiffs cannot take advantage of any equitable exceptions to the continuous ownership requirement because the entities in question are not corporations. To support this contention, they again rely on *Bax*. That decision did not address equitable exceptions to standing doctrines. It addressed whether a creditor of an insolvent LLC could assert a derivative claim. *Bax*, 28 A.3d at 1043. The Delaware Supreme Court held that it could not, citing "[t]he plain language of 6 *Del. C.* § 18-1002," which only granted standing to members and assignees. *Id.* at 1041.

The creditor in *Bax* asked the Delaware Supreme Court to expand the parties who could sue derivatively, contending that the high court could do so as a matter of equity. In support of this argument, the creditor cited Section 18-1104 of the LLC Act, which then

stated, "In any case not provided for in this chapter, the rules of law and equity, including

the law merchant, shall govern." 6 *Del. C.* § 18-1104 (2011). Applying the plain meaning

of that section, the Delaware Supreme Court explained that

> what this means is that where the General Assembly has not defined a right, remedy, or obligation with respect to an LLC, courts should apply the common law. It follows that if the General Assembly *has* defined a right, remedy, or obligation with respect to an LLC, courts cannot interpret the common law to override the express provisions the General Assembly adopted. Supplementing express provisions is altogether different from displacing them or interpreting them out of existence under the guise of articulating and applying equitable principles.

*Bax*, 28 A.3d at 1045.[23]

The sections on derivative standing in the LLC Act and LP Act do not address what

happens when the transaction that would deprive a plaintiff of standing is tainted by fraud.

They also do not address what happens when the transaction is a reorganization that

amounts to a reshuffling of the existing ownership interests. In these settings, under the

current version of Section 18-1104, "the rules of law and equity, including the rules of law

and equity relating to fiduciary duties and the law merchant, shall govern." 6 *Del. C.* § 18-

1104; *accord* 6 *Del. C.* § 17-1104. The *Bax* decision therefore does not foreclose the

availability of equitable exceptions.

---

[23] The *Bax* decision adopted a strongly contractarian view of LLCs. In 2013, the General Assembly amended Section 18-1104 to provide as follows: "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern." 6 *Del. C.* § 18-1104; *see* H.B. 126, 147th Gen. Assem. § 8 (2013). The amendment made clear that default principles of fiduciary duty apply under the LLC Act and rejected the purely contractarian view of LLCs. *See In re Carlisle Etcetera LLC*, 114 A.3d 592, 605 (Del. Ch. 2015).

Viewing the issue more broadly, the continuous ownership requirement is itself a judicially created doctrine that the Delaware Supreme Court has applied to alternative entities. It seems logical that the high court would have intended to apply both the general rule and its recognized exceptions, not just the general rule.

The plaintiffs therefore have standing to bring double-derivative claims on behalf of DVRC to address misconduct that occurred before the Reorganization. That reshuffling of their interests, which at this stage of the case inferably resulted from fraud, does not foreclose them from pursuing their double-derivative claims.

### 2. Conduct After The Reorganization

Manheim and WestCo also contend that the plaintiffs lack standing to bring claims on behalf of DVRC for conduct that occurred after the Reorganization, citing the fact that they are no longer members of DVRC. As with pre-Reorganization conduct, this argument fails because the plaintiffs have double-derivative standing to assert these claims.

For the reasons already discussed, Penfold has standing as a member in DVRC to assert claims derivatively on behalf of DVRC. *See* 6 *Del. C.* § 18-1002. For conduct that occurred after the Reorganization, Penfold was both a member at the time of bringing the action and at the time of the conduct of which the plaintiff complains.

As limited partners in Penfold, Bamford and Ban can sue derivatively to cause Penfold to assert its right to sue derivatively on behalf of DVRC. *See* 6 *Del. C.* § 17-1002. Bamford and Ban were partners "at the time of bringing the action." For post-Reorganization conduct, they also were partners "[a]t the time of the transaction of which the plaintiff complains." Bamford and Ban have also held their limited partnership interests

67

in Penfold continuously since the Reorganization, which means they have held their limited partnership interests continuously since any post-Reorganization misconduct occurred. Bamford and Ban thus have standing to assert double-derivative claims on behalf of DVRC for post-Reorganization conduct.

**F.    Counts III And V: The Plaintiffs' Derivative And Double-Derivative Claims On Behalf Of Penfold And DVRC For Fraud Against Manheim And His Affiliates**

In Count III of the complaint, the plaintiffs assert a derivative claim on behalf of Penfold which contends that Manheim and ReathCo defrauded Penfold by engaging in self-dealing transactions. In Count V, plaintiffs have sued derivatively on behalf of Penfold to cause it to assert a derivative claim to similar effect on behalf of DVRC and against Manheim, WestCo, and ReathCo. These claims are dismissed.

The claims asserted in Counts III and V attempt to use the language of fraud to recover for self-dealing. Count III alleges that Manheim and ReathCo defrauded Penfold by concealing their self-dealing from Penfold. Compl. ¶ 140. The complaint alleges:

> 141. Manheim's and [ReathCo's] acts, statements, and/or omissions were misleading and deceptive and done with the intent that Penfold's partnership would rely on those acts, statements and/or omissions to the partnership's detriment.
>
> 142. Penfold acted in justifiable reliance upon those acts, statements, and/or omissions, by not taking steps it otherwise would to stop Manheim and [ReathCo's] harmful conduct.
>
> 143. As a result of Penfold's reliance on Manheim's and [ReathCo's] fraudulent misrepresentations and/or omissions Penfold has suffered significant damages, including actual damages for breach of contract, loss of unpaid dividends, costs, and attorneys' fees.

Count V contains similar allegations, but advances them on behalf of DVRC and against Manheim, WestCo, and ReathCo.

It is of course possible for an entity to be defrauded, including by individuals who serve as its directors, officers, or agents. In this case, however, the fraud claims are the functional equivalent of claims that Penfold's and DVRC's fiduciaries breached their duties by engaging in self-interested transactions. "[T]he breach of fiduciary duty count confronts directly the implications of the fiduciary relationship, rendering the constructive fraud count redundant and superfluous." *Wayport*, 76 A.3d at 327; *see Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236–37 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

Count V duplicates and is subsumed within the double-derivative claim for breach of fiduciary duty that the plaintiffs asserted in Count II. *See* Part II.E, *supra*. Count III duplicates and is subsumed within the derivative claim for breach of fiduciary duty that the plaintiffs asserted in Count I and which the defendants did not move to dismiss. At this stage, it is not reasonably conceivable that there could be a set of facts where the plaintiffs could prevail on Counts III and V unless they also prevailed on their more apt claims for breach of fiduciary duty.[24] Counts III and V are therefore dismissed.

---

[24] As to Count V and its overlap with Count II, this is an oversimplification. Count V names Manheim, WestCo, and ReathCo as the alleged fraudsters. Count II names Manheim and WestCo as the allegedly faithless fiduciaries. The claim for fraud in Count V thus seeks to reach ReathCo, while the claim for breach of fiduciary in Count II does not. Count II nevertheless seeks to hold Manheim and WestCo liable for conduct involving

ReathCo, such as for transfers to ReathCo. Manheim controls ReathCo, making him accountable for these transactions.

As a practical matter, the omission of ReathCo from Count II does not seem likely to be significant. If Manheim caused DVRC to engage in an interested transaction with ReathCo, such that ReathCo could be liable under the plaintiffs' fraud theory, then Manheim would likely be liable as a fiduciary for having caused the transaction to take place. Conversely, it seems unlikely that the plaintiffs might obtain a judgment against Manheim for breach of fiduciary duty, yet not be able to collect because the assets sat within ReathCo.

From the standpoint of procedural purity, the naming of ReathCo in Count V would seem to require embarking on an analysis of the plaintiffs' conceptually difficult fraud claim so as to determine whether to preserve a pleading-stage right of action against ReathCo, albeit one that seems unlikely to have real world value. Given the other demands of my docket, that is an unappetizing prospect. Nor do the parties seem particularly interested in the answer, since they did not regard the omission of ReathCo from Count II as something worth emphasizing in their briefs. There is also an obvious solution that plaintiffs routinely deploy, which is to name the affiliate as an alleged aider and abetter. When a breach of fiduciary duty claim survives against an affiliate's controller, then the aiding and abetting claim against the affiliate generally survives as well, both because the knowledge of the controller is imputed to the affiliate for purposes of the knowing participation requirement, and because the viable claim for breach of duty against the controller satisfies the other elements of the aiding and abetting claim.

For now I will decline to engage in a detailed parsing of the theoretically non-duplicative fraud claim against ReathCo. If discovery suggests a role for this claim, then subject to the law of the case doctrine, the plaintiffs may seek to revisit the interlocutory dismissal of Count II for good cause shown. *See Quadrant Structured Prods. Co., Ltd. v. Vertin* (*Quadrant II*), 2014 WL 5465535, at *5 (Del. Ch. Oct. 28, 2014). The plaintiffs may also address any pleading-stage gap through an aiding and abetting claim. An amendment to assert such an obvious claim at the outset of the case is not prejudicial to the defendants, and there is good reason to think that it is technically unnecessary. The Court of Chancery Rules are modeled on the Federal Rules of Civil Procedure, and the Wright & Miller treatise explains at length why the federal rules do not require count-specific causes of action that subsequently confine for the duration of the litigation the legal theories available to the pleader and the trial judge. *See* Wright & Miller, *supra*, § 1219 (explaining why "[t]he federal rules effectively abolish the restrictive theory of the pleadings doctrine"). I have elsewhere explained (albeit in a transcript ruling) why I believe the same is true under the Delaware rules. *See In re EZCorp. Inc. Consulting Agreement Deriv. Litig.*, C.A. No. 9962-VCL, tr. at 72-90 (Del. Ch. Feb. 22, 2016).

**G. Count IV: The Plaintiffs' Derivative Claim On Behalf Of Penfold For Breach Of Its Limited Partnership Agreement**

In Count IV, the plaintiffs bring a breach of contract claim derivatively on behalf of Penfold and against Manheim and ReathCo for breach of Penfold's limited partnership agreement. "In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "Proof of [alleged] damages and their certainty need not be offered in the complaint in order to state a claim." *Anglo Am.*, 829 A.2d at 156.

The complaint alleges that under Penfold's limited partnership agreement, "the General Partner must indemnify Penfold and the limited partners for any loss, damage or liability, including reasonable attorneys' fees, due to or arising out of the General Partner's 'fraud or willful malfeasance.'" Compl. ¶ 63. Elsewhere, the complaint describes the provision somewhat differently. *See id.* ¶ 145. Because the former allegation is more favorable to the plaintiffs, the court adopts it for purposes of the motion to dismiss.

---

Although primarily directed to the fraud claim asserted against ReathCo, my comment about the plaintiffs' ability to revisit this interlocutory ruling applies to Counts III and V as a whole. The predictive power of the human mind is limited, so it is necessarily possible that the seemingly inconceivable may prove factual. If discovery suggests a scenario where Counts III and V would have independent heft, then subject to the law of the case doctrine, the plaintiffs may seek to revisit this interlocutory dismissal for good cause shown. *See Quadrant II*, 2014 WL 5465535, at *5.

The complaint alleges that the defendants engaged in fraudulent and intentional misconduct that harmed Penfold and its limited partners. The complaint alleges that Manheim and ReathCo are Penfold's general partners. Based on the allegations in the complaint, Manheim and ReathCo have an obligation to indemnify Penfold and its limited partners for any harm they cause due to fraud or willful malfeasance. They have not done so, resulting in a claim for breach. Although it seems unlikely that the provision actually operates as the complaint alleges, the parties have not provided the court with a copy of the limited partnership agreement, so the court must accept the allegations of the complaint.

The defendants contend that the indemnification claim is not ripe because "[t]here has been no finding of fraud or willful malfeasance by either Manheim or [ReathCo]." Dkt. 133 at 13. "[I]ndemnification claims do not typically ripen until *after* the merits of an action have been decided, and all appeals have been resolved." *Hampshire*, 2010 WL 2739995, at *53. It seems likely that the provision would require a finding of fraud or willful malfeasance before a claim for indemnification could be ripe, but no one submitted a copy of the limited partnership agreement. At the pleading stage, the court must accept the allegations of the complaint, which advance the admittedly counterintuitive position that Manheim and ReathCo currently have an obligation to indemnify Penfold and its limited partners.

For present purposes, the motion to dismiss Count IV is denied. A motion for summary judgment may provide an efficient vehicle for addressing this claim.

**H.  Count X: The Plaintiffs' Derivative Claim On Behalf Of Penfold For Unjust Enrichment**

In Count X, the plaintiffs assert a derivative claim for unjust enrichment on behalf of Penfold against Manheim to recover the compensation and other benefits that he has extracted.[25] The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

A claim for unjust enrichment claim is usually a fallback claim. In a situation where a plaintiff proves a primary claim against one defendant, such as a claim for breach of fiduciary duty, but another defendant is not primarily liable and yet reaped the benefits of the wrongdoing, then unjust enrichment can provide a means of holding the other defendant accountable. If both defendants are primarily liable, then the claim for unjust enrichment will be duplicative and unnecessary. At the pleading stage, when there is uncertainty about how the case will play out, it makes sense to preserve the claim for unjust enrichment and permit the plaintiff to plead in the alternative. *See Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011).

---

[25] The plaintiffs also purport to assert a direct claim for unjust enrichment, contending that they have been deprived as equity holders of distributions and other benefits that they otherwise would have received if Manheim had not taken the money. A claim for unjust enrichment can be personal, direct, or derivative, depending on the facts alleged. *See Urdan*, 2019 WL 3891720, at *20-21. Here, the allegations focus on self-dealing payments that Manheim caused Penfold to make, so the clam is exclusively derivative. *See El Paso*, 152 A.3d at 1260–65.

In this case, it is not reasonably conceivable that the claim for unjust enrichment will serve any purpose. The claim seeks to recover from Manheim, who is the primary wrongdoer under all of the other theories in the complaint. It is not reasonably conceivable that the enrichment Manheim has received could prove to be unjust without Manheim having been held liable on one of the other claims. Count X is therefore dismissed.

## III.    CONCLUSION

The defendants' motion to dismiss is granted as to Counts III, V, and X in their entirety. The defendants' motion to dismiss is granted as to Count XII with respect to Ban's claim for negligent misrepresentation based on his compensation. The defendants' motion to dismiss is otherwise denied.